# UNITED STATES *v.* RON PAIR ENTERPRISES, INC.

No. 87–1043.   Argued October 31, 1988—Decided February 22, 1989

BLACKMUN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, SCALIA, and KENNEDY, JJ., joined. O'CONNOR, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, *post*, p. 249.

*Deputy Solicitor General Wallace* argued the cause for the United States. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Rose, Alan I. Horowitz, Wynette J. Hewett,* and *Martha B. Brissette.*

*I. William Cohen* argued the cause for respondent. With him on the brief was *Michael H. Traison.**

---

*George Kaufmann, Peter W. Morgan,* and *Lawrence D. Garr* filed a brief for United Refining Co. as *amicus curiae* urging affirmance.

JUSTICE BLACKMUN delivered the opinion of the Court.

In this case we must decide the narrow statutory issue whether § 506(b) of the Bankruptcy Code of 1978, 11 U. S. C. § 506(b) (1982 ed., Supp. IV), entitles a creditor to receive postpetition interest on a nonconsensual oversecured claim allowed in a bankruptcy proceeding. We conclude that it does, and we therefore reverse the judgment of the Court of Appeals.

I

Respondent Ron Pair Enterprises, Inc., filed a petition for reorganization under Chapter 11 of the Bankruptcy Code on May 1, 1984, in the United States Bankruptcy Court for the Eastern District of Michigan. The Government filed timely proof of a prepetition claim of $52,277.93, comprised of assessments for unpaid withholding and Social Security taxes, penalties, and prepetition interest. The claim was perfected through a tax lien on property owned by respondent. Respondent's First Amended Plan of Reorganization, filed October 1, 1985, provided for full payment of the prepetition claim, but did not provide for postpetition interest on that claim. The Government filed a timely objection, claiming that § 506(b) allowed recovery of postpetition interest, since the property securing the claim had a value greater than the amount of the principal debt. At the Bankruptcy Court hearing, the parties stipulated that the claim was oversecured, but the court subsequently overruled the Government's objection. The Government appealed to the United States District Court for the Eastern District of Michigan. That court reversed the Bankruptcy Court's judgment, concluding that the plain language of § 506(b) entitled the Government to postpetition interest.

The United States Court of Appeals for the Sixth Circuit, in its turn, reversed the District Court. 828 F. 2d 367 (1987). While not directly ruling that the language of § 506(b) was ambiguous, the court reasoned that reference to pre-Code law was appropriate "in order to better understand

the context in which the provision was drafted and therefore the language itself." *Id.*, at 370. The court went on to note that under pre-Code law the general rule was that postpetition interest on an oversecured prepetition claim was allowable only where the lien was consensual in nature. In light of this practice, and of the lack of any legislative history evincing an intent to change the standard, the court held that § 506(b) codified the pre-existing standard, and that postpetition interest was allowable only on consensual claims. Because this result was in direct conflict with the view of the Court of Appeals for the Fourth Circuit, see *Best Repair Co.* v. *United States*, 789 F. 2d 1080 (1986), and with the views of other courts,[1] we granted certiorari, 485 U. S. 958 (1988), to resolve the conflict.

## II

Section 506,[2] enacted as part of the extensive 1978 revision of the bankruptcy laws, governs the definition and treatment

---

[1] Most bankruptcy courts interpreting § 506(b) have permitted the holder of an oversecured claim to recover postpetition interest. These courts have considered both state and federal tax liens, see, *e. g., In re Brandenburg*, 71 B. R. 719 (SD 1987); *In re Busone*, 71 B. R. 201 (EDNY 1987); *In re Gilliland*, 67 B. R. 410 (ND Tex. 1986); *In re Hoffman*, 28 B. R. 503 (Md. 1983), and private nonconsensual liens, such as judicial and mechanic's liens, see, *e. g., In re Charter Co.*, 63 B. R. 568 (MD Fla. 1986); *In re Romano*, 51 B. R. 813 (MD Fla. 1985); *In re Morrissey*, 37 B. R. 571 (ED Va. 1984). One other Court of Appeals and a leading commentator have taken the position that § 506(b) codifies pre-Code law and distinguishes between consensual and nonconsensual liens in determining the allowance of postpetition interest. See *In re Newbury Cafe, Inc.*, 841 F. 2d 20 (CA1 1988), cert. pending, No. 87–1784; 3 Collier on Bankruptcy ¶ 506.05, p. 506–41, and n. 5b (15th ed. 1988).

[2] Section 506, as amended, reads:

"(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so sub-

of secured claims, *i. e.*, claims by creditors against the estate that are secured by a lien on property in which the estate has an interest. Subsection (a) of § 506 provides that a claim is secured only to the extent of the value of the property on which the lien is fixed; the remainder of that claim is considered unsecured.[3] Subsection (b) is concerned specifically with oversecured claims, that is, any claim that is for an amount less than the value of the property securing it. Thus, if a $50,000 claim were secured by a lien on property having a value of $75,000, the claim would be oversecured, provided the trustee's costs of preserving or disposing of the property were less than $25,000. Section 506(b) allows a

---

ject to setoff is less than the amount of such allowed claim. Such value should be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

"(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

"(c) The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

"(d) To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless—

"(1) such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or

"(2) such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title." 11 U. S. C. § 506 (1982 ed. and Supp. IV).

[3] Thus, a $100,000 claim, secured by a lien on property of a value of $60,000, is considered to be a secured claim to the extent of $60,000, and to be an unsecured claim for $40,000. See 3 Collier on Bankruptcy ¶ 506.04, p. 506–15 (15th ed. 1988) ("[S]ection 506(a) requires a bifurcation of a 'partially secured' or 'undersecured' claim into separate and independent secured claim and unsecured claim components").

holder of an oversecured claim to recover, in addition to the prepetition amount of the claim, "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose."

The question before us today arises because there are two types of secured claims: (1) voluntary (or consensual) secured claims, each created by agreement between the debtor and the creditor and called a "security interest" by the Code, 11 U. S. C. § 101(45) (1982 ed., Supp. IV), and (2) involuntary secured claims, such as a judicial or statutory lien, see 11 U. S. C. §§ 101(32) and (47) (1982 ed., Supp. IV), which are fixed by operation of law and do not require the consent of the debtor. The claim against respondent's estate was of this latter kind. Prior to the passage of the 1978 Code, some Courts of Appeals drew a distinction between the two types for purposes of determining postpetition interest. The question we must answer is whether the 1978 Code recognizes and enforces this distinction, or whether Congress intended that all oversecured claims be treated the same way for purposes of postpetition interest.

### III

Initially, it is worth recalling that Congress worked on the formulation of the Code for nearly a decade. It was intended to modernize the bankruptcy laws, see H. R. Rep. No. 95–595, p. 3 (1977) (Report), and as a result made significant changes in both the substantive and procedural laws of bankruptcy. See *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 52–53 (1982) (plurality opinion). In particular, Congress intended "significant changes from current law in . . . the treatment of secured creditors and secured claims." Report, at 180. In such a substantial overhaul of the system, it is not appropriate or realistic to expect Congress to have explained with particularity each step it took. Rather, as long as the statutory scheme is coherent and consistent, there generally is no

need for a court to inquire beyond the plain language of the statute.

## A

The task of resolving the dispute over the meaning of § 506(b) begins where all such inquiries must begin: with the language of the statute itself. *Landreth Timber Co.* v. *Landreth*, 471 U. S. 681, 685 (1985). In this case it is also where the inquiry should end, for where, as here, the statute's language is plain, "the sole function of the courts is to enforce it according to its terms." *Caminetti* v. *United States*, 242 U. S. 470, 485 (1917). The language before us expresses Congress' intent—that postpetition interest be available—with sufficient precision so that reference to legislative history and to pre-Code practice is hardly necessary.

The relevant phrase in § 506(b) is: "[T]here shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." "Such claim" refers to an oversecured claim. The natural reading of the phrase entitles the holder of an oversecured claim to postpetition interest and, in addition, gives one having a secured claim created pursuant to an agreement the right to reasonable fees, costs, and charges provided for in that agreement. Recovery of postpetition interest is unqualified. Recovery of fees, costs, and charges, however, is allowed only if they are reasonable and provided for in the agreement under which the claim arose. Therefore, in the absence of an agreement, postpetition interest is the only added recovery available.

This reading is also mandated by the grammatical structure of the statute. The phrase "interest on such claim" is set aside by commas, and separated from the reference to fees, costs, and charges by the conjunctive words "and any." As a result, the phrase "interest on such claim" stands independent of the language that follows. "[I]nterest on such claim" is not part of the list made up of "fees, costs, or

charges," nor is it joined to the following clause so that the final "provided for under the agreement" modifies it as well. See *Best Repair Co.* v. *United States*, 789 F. 2d, at 1082. The language and punctuation Congress used cannot be read in any other way.[4]  By the plain language of the statute, the two types of recovery are distinct.[5]

B

The plain meaning of legislation should be conclusive, except in the "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Griffin* v. *Oceanic Contractors, Inc.*, 458 U. S. 564, 571 (1982).  In such cases, the intention of the drafters, rather than the strict language, controls. *Ibid.*  It is clear that allowing postpetition interest on

---

[4] The United States Court of Appeals for the Fourth Circuit pointed out in *Best Repair Co.* that, had Congress intended to limit postpetition interest to consensual liens, § 506(b) could have said: "there shall be allowed to the holder of such claim, as provided for under the agreement under which such claim arose, interest on such claim and any reasonable fees, costs or charges." 789 F. 2d, at 1082, n. 2.  A less clear way of stating this, closer to the actual language, would be: "there shall be allowed to the holder of such claim, interest on such claim and reasonable fees, costs, and charges provided for under the agreement under which such claim arose." *Ibid.*

[5] It seems to us that the interpretation adopted by the Court of Appeals in this case not only requires that the statutory language be read in an unnatural way, but that it is inconsistent with the remainder of § 506 and with terminology used throughout the Code.  Adopting the Court of Appeals' view would mean that § 506(b) is operative only in regard to consensual liens, *i. e.*, that only a holder of an oversecured claim arising from an agreement is entitled to any added recovery.  But the other portions of § 506 make no distinction between consensual and nonconsensual liens. Moreover, had Congress intended § 506(b) to apply only to consensual liens, it would have clarified its intent by using the specific phrase, "security interest," which the Code employs to refer to liens created by agreement. 11 U. S. C. § 101(45) (1982 ed., Supp. IV).  When Congress wanted to restrict the application of a particular provision of the Code to such liens, it used the term "security interest."  See, *e. g.*, 11 U. S. C. §§ 362(b)(12) and (13), 363(a), 547(c)(3)–(5), 552, 752(c), 1110(a), 1168(a), 1322(b)(2) (1982 ed. and Supp. IV).

nonconsensual oversecured liens does not contravene the intent of the framers of the Code. Allowing such interest does not conflict with any other section of the Code, or with any important state or federal interest; nor is a contrary view suggested by the legislative history.[6] Respondent has not articulated, nor can we discern, any significant reason why Congress would have intended, or any policy reason would compel, that the two types of secured claims be treated differently in allowing postpetition interest.

## C

Respondent urges that pre-Code practice drew a distinction between consensual and nonconsensual liens for the purpose of determining entitlement to postpetition interest, and that Congress' failure to repudiate that distinction requires us to enforce it. It is respondent's view, as it was the view of the Court of Appeals, that *Midlantic National Bank* v. *New Jersey Dept. of Environmental Protection*, 474 U. S. 494 (1986), and *Kelly* v. *Robinson*, 479 U. S. 36 (1986), so require. We disagree.

In *Midlantic* we held that § 554(a) of the Code, 11 U. S. C. § 554(a), which provides that "the trustee may abandon any property of the estate that is burdensome to the estate," does not give a trustee the authority to violate state health and safety laws by abandoning property containing hazardous wastes. 474 U. S., at 507. In reaching that conclusion, we noted that according to pre-Code doctrine the trustee's au-

---

[6] See H. R. 6, 95th Cong., 1st Sess. (1977); H. R. 8200, 95th Cong., 1st Sess. (1977); S. 2266, 95th Cong., 1st Sess. (1977). Because the final version of the statute contained the same language as that initially introduced, there was no change during the legislative process that could shed light on the meaning of the allowance of interest. See generally 3 Collier on Bankruptcy ¶ 506.03, pp. 506–7 to 506–12. Neither the Committee Reports nor the statements by the managers of the legislation discuss the question of postpetition interest at all. See Report, at 356; S. Rep. No. 95–989, p. 68 (1978); 124 Cong. Rec. 32398 (1978) (statement of Rep. Edwards); *id.*, at 33997 (statement of Sen. DeConcini).

thority to dispose of property could be limited in order "to protect legitimate state or federal interests." *Id.*, at 500. But we did not rest solely, or even primarily, on a presumption of continuity with pre-Code practice. Rather, we concluded that a contrary result would render abandonment doctrine inconsistent with other provisions of the Code itself, which embody the principle that "the trustee is not to have *carte blanche* to ignore nonbankruptcy law." *Id.*, at 502. We also recognized that the outcome sought would be not only a departure from pre-Code practice, but also "an extraordinary exemption from nonbankruptcy law," *id.*, at 501, requiring some clearer expression of congressional intent. We relied as well on Congress' repeated emphasis in environmental legislation "on its 'goal of protecting the environment against toxic pollution.'" *Id.*, at 505, quoting *Chemical Manufacturers Assn.* v. *Natural Resources Defense Council, Inc.*, 470 U. S. 116, 143 (1985). To put it simply, we looked to pre-Code practice for interpretive assistance, because it appeared that a literal application of the statute would be "demonstrably at odds with the intentions of its drafters." *Griffin* v. *Oceanic Contractors, Inc.*, 458 U. S., at 571.

A similar issue presented itself in *Kelly* v. *Robinson, supra,* where we held that a restitution obligation, imposed as part of a state criminal sentence, was not dischargeable in bankruptcy. We reached this conclusion by interpreting § 523(a)(7) of the Code,[7] 11 U. S. C. § 523(a)(7), as "preserv-[ing] from discharge any condition a state criminal court imposes as part of a criminal sentence." 479 U. S., at 50. We noted that the Code provision was "subject to interpretation," *ibid.*, and considered both legislative history and pre-Code practice in aid of that interpretation. But in determin-

---

[7] Section 523(a)(7) provides that a discharge in bankruptcy does not affect any debt that "is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss . . . ."

ing that Congress had not intended to depart from pre-Code practice in this regard, we did not rely on a pale presumption to that effect. We concluded that the pre-Code practice had been animated by "a deep conviction that federal bankruptcy courts should not invalidate the results of state criminal proceedings," *id.*, at 47, which has its source in the basic principle of our federalism that "the States' interest in administering their criminal justice systems free from federal interference is one of the most powerful of the considerations that should influence a court considering equitable types of relief." *Id.*, at 49. In *Kelly*, as in *Midlantic*, pre-Code practice was significant because it reflected policy considerations of great longevity and importance.[8]

*Kelly* and *Midlantic* make clear that, in an appropriate case, a court must determine whether Congress has expressed an intent to change the interpretation of a judicially created concept in enacting the Code. But *Midlantic* and *Kelly* suggest that there are limits to what may constitute an appropriate case. Both decisions concerned statutory language which, at least to some degree, was open to interpretation. Each involved a situation where bankruptcy law, under the proposed interpretation, was in clear conflict with state or federal laws of great importance. In the present case, in contrast, the language in question is clearer than the language at issue in *Midlantic* and *Kelly*: as written it directs that postpetition interest be paid on all oversecured claims. In addition, this natural interpretation of the statutory language does not conflict with any significant state or federal interest, nor with any other aspect of the Code. Although the payment of postpetition interest is arguably somewhat in tension with the desirability of paying all creditors as uni-

---

[8] The rule preventing discharge of criminal fines was articulated promptly after the Bankruptcy Act of 1898 was passed, see *In re Moore*, 111 F. 145, 148–149 (WD Ky. 1901), and was uniformly accepted at the time Congress was considering the Code. See *Kelly* v. *Robinson*, 479 U. S., at 45–46.

formly as practicable, Congress expressly chose to create that alleged tension. There is no reason to suspect that Congress did not mean what the language of the statute says.

## D

But even if we saw the need to turn to pre-Code practice in this case, it would be of little assistance. The practice of denying postpetition interest to the holders of nonconsensual liens, while allowing it to holders of consensual liens, was an exception to an exception, recognized by only a few courts and often dependent on particular circumstances. It was certainly not the type of "rule" that we assume Congress was aware of when enacting the Code; nor was it of such significance that Congress would have taken steps other than enacting statutory language to the contrary.

There was, indeed, a pre-Code rule that the running of interest ceased when a bankruptcy petition was filed. See *Sexton* v. *Dreyfus*, 219 U. S. 339, 344 (1911). Two exceptions to this rule had been recognized under pre-Code practice. The first allowed postpetition interest when the debtor ultimately proved to be solvent; the second allowed dividends and interest earned by securities held by the creditor as collateral to be applied to postpetition interest. See *City of New York* v. *Saper*, 336 U. S. 328, 330, n. 7 (1949). Neither of these exceptions would be relevant to this case. A third exception was of more doubtful provenance: an exception for oversecured claims. At least one Court of Appeals refused to apply this exception, *United States* v. *Harrington*, 269 F. 2d 719, 722 (CA4 1959), and there was some uncertainty among courts which did recognize it as to whether this Court ever had done so. *United States* v. *Bass*, 271 F. 2d 129, 131, n. 3 (CA9 1959); but see *Vanston Bondholders Protective Committee* v. *Green*, 329 U. S. 156, 159 (1946).

What is at issue in this case is not the oversecured claim exception *per se*, but an exception to that exception. Several Courts of Appeals refused to apply the oversecured

claim exception to an oversecured federal tax claim. See *United States* v. *Harrington,* 269 F. 2d, at 722–723 (holding that even if there were a general exception for oversecured claims, it would not apply to tax liens); *United States* v. *Bass,* 271 F. 2d, at 132; *In re Kerber Packing Co.,* 276 F. 2d 245, 247–248 (CA7 1960); see also *In re Boston & Maine Corp.,* 719 F. 2d 493, 496 (CA1 1983) (municipal property tax claim), cert. denied *sub nom. City of Cambridge* v. *Meserve,* 466 U. S. 938 (1984). But see *In re Parchem,* 166 F. Supp. 724, 730 (Minn.) (allowing postpetition interest on tax claim), appeal dism'd upon stipulation, 261 F. 2d 839 (CA8 1958); *In re Ross Nursing Home,* 2 B. R. 496, 499–500 (Bkrtcy., EDNY 1980) (same). It is this refusal to apply the exception that the Court of Appeals thought constituted a well-established judicially created rule.

The fact that this Court never clearly has acknowledged or relied upon this limitation on the oversecured-claim exception counsels against concluding that the limitation was well recognized. Also arguing against considering this limitation a clear rule is the fact that all the cases that limited the third exception were tax-lien cases. Each gave weight to *City of New York* v. *Saper, supra,* where this Court had ruled that postpetition interest was not available on *unsecured* tax claims, and reasoned that the broad language of that case denied it for all tax claims. See *United States* v. *Harrington,* 269 F. 2d, at 721–722; *United States* v. *Bass,* 271 F. 2d, at 132; *In re Kerber Packing Co.,* 276 F. 2d, at 247.[9] The rule

---

[9] Some pre-Code courts also distinguished between the two types of liens because nonconsensual liens were often fixed to the entirety of a debtor's property, while consensual liens usually were fixed to a particular item of property. Whatever the merit of the distinction, modern commercial lending practices have changed, and it is not unusual for commercial lenders to obtain a lien on almost all of the debtor's property. Congress, in enacting the Code, was aware of this, see Report, at 127, and in fact took specific steps to deal with such blanket liens on household goods, see 11 U. S. C. § 522(f)(2). On the other hand, not all nonconsensual liens attach broadly to a debtor's property. A typical mechanic's or construction

articulated in these cases never was extended to other forms of nonconsensual liens. Obviously, there is no way to read § 506(b) as allowing postpetition interest on all oversecured claims except claims based on unpaid taxes. For this reason, the statute Congress wrote is simply not subject to a reading that would harmonize it with the supposed pre-Code rule.

More importantly, this "rule," in the few cases where it was recognized, was only a guide to the trustee's exercise of his powers in the particular circumstances of the case. We have noted that "the touchstone of each decision on allowance of interest in bankruptcy . . . has been a balance of equities between creditor and creditor or between creditors and the debtor." *Vanston Bondholders Protective Committee* v. *Green*, 329 U. S., at 165. All the exceptions to the denial of postpetition interest "are not rigid doctrinal categories. Rather, they are flexible guidelines which have been developed by the courts in the exercise of their equitable powers in insolvency proceedings." *In re Boston & Maine Corp.*, 719 F. 2d, at 496. None of the cases cited by the Court of Appeals states that the doctrine does anything more than provide a bankruptcy court with guidance in the exercise of its equitable powers. As such, there is no reason to think that Congress, in enacting a contrary standard, would have felt the need expressly to repudiate it. The contrary view, which is the view we adopt today, is more consistent with Congress' stated intent, in enacting the Code, to "codif[y] creditors' rights *more clearly than the case law* . . . [by] defin[ing] the protections to which a secured creditor is entitled, and the means through which the court may grant that protection." Report, at 4–5 (emphasis added). Whether or

lien is limited to the property on which the improvement is made. See T. Crandall, R. Hagedorn, & F. Smith, Debtor-Creditor Law Manual ¶ 9.02[2] (1985).

not Congress took notice of the pre-Code standard, it acted with sufficient clarity in enacting the statute.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE O'CONNOR, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE STEVENS join, dissenting.

The Court's decision is based on two distinct lines of argument. First, the Court concludes that the language of § 506(b) of the Bankruptcy Code, 11 U. S. C. § 506(b), is clear and unambiguous. Second, the Court takes a very narrow view of *Midlantic National Bank* v. *New Jersey Dept. of Environmental Protection,* 474 U. S. 494 (1986), and its progeny. I disagree with both aspects of the Court's opinion, and with the conclusion to which they lead.

The relevant portion of § 506(b) provides that "there shall be allowed to the holder of [an oversecured] claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." The Court concludes that the only natural reading of § 506(b) is that recovery of postpetition interest is "unqualified." *Ante,* at 241. As Justice Frankfurter remarked some time ago, however: "The notion that because the words of a statute are plain, its meaning is also plain, is merely pernicious oversimplification." *United States* v. *Monia,* 317 U. S. 424, 431 (1943) (dissenting opinion).

Although "the use of the comma is exceedingly arbitrary and indefinite," *United States* v. *Palmer,* 3 Wheat. 610, 638 (1818) (separate opinion of Johnson, J.), the Court is able to read § 506(b) the way that it does only because of the comma following the phrase "interest on such claim." Without this "capricious" bit of punctuation, *In re Newbury Cafe, Inc.,* 841 F. 2d 20, 22 (CA1 1988), cert. pending, No. 87–1784, the relevant portion of § 506(b) would read as follows: "there shall be allowed to the holder of [an oversecured] claim, interest on such claim and any reasonable fees, costs, or charges pro-

vided for under the agreement under which such claim arose." The phrase "interest on such claim" would be qualified by the phrase "provided for under the agreement under which such claim arose," and nonconsensual liens would not accrue postpetition interest. See *Porto Rico Railway, Light & Power Co.* v. *Mor*, 253 U. S. 345, 348 (1920) ("When several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all"). This conclusion is not altered by the fact that the words "and any" follow the phrase "interest on such claim." Those words simply indicate that interest accrues only on the amount of the claim, and not on "fees, costs, or charges" that happen to be incurred by the creditor.

The Court's reliance on the comma is misplaced. "[P]unctuation is not decisive of the construction of a statute." *Costanzo* v. *Tillinghast*, 287 U. S. 341, 344 (1932). See also *Barrett* v. *Van Pelt*, 268 U. S. 85, 91 (1925) ("'Punctuation is a minor, and not a controlling, element in interpretation, and courts will disregard the punctuation of a statute, or re-punctuate it, if need be, to give effect to what otherwise appears to be its purpose and true meaning'"); *Ewing* v. *Burnet*, 11 Pet. 41, 53–54 (1837) ("Punctuation is a most fallible standard by which to interpret a writing; it may be resorted to when all other means fail; but the court will first take the instrument by its four corners, in order to ascertain its true meaning: if that is apparent on judicially inspecting the whole, the punctuation will not be suffered to change it"). Under this rule of construction, the Court has not hesitated in the past to change or ignore the punctuation in legislation in order to effectuate congressional intent. See, *e. g.*, *Simpson* v. *United States*, 435 U. S. 6, 11–12, n. 6 (1978) (ignoring punctuation and conjunction so that qualifying phrase would modify antecedent followed by comma and the word "or"); *Stephens* v. *Cherokee Nation*, 174 U. S. 445, 479–480 (1899) (ignoring

punctuation so that qualifying phrase would restrict anteced-ent set off by commas and followed by the word "and").

Although punctuation is not controlling, it can provide use-ful confirmation of conclusions drawn from the words of a statute. *United States* v. *Naftalin*, 441 U. S. 768, 774, n. 5 (1979). The Court attempts to buttress its interpretation of § 506(b) by suggesting that any other reading would be in-consistent with the remaining portions of § 506, which "make no distinction between consensual and nonconsensual liens." *Ante*, at 242, n. 5. But § 506(b), regardless of how it is read, does distinguish between types of liens. The phrase "pro-vided for under the agreement under which such claim arose" certainly refers to consensual liens, and must qualify some preceding language. Even under the Court's interpretation, "reasonable fees, costs, or charges" can only be awarded if provided for in a consensual lien. Thus, limiting postpetition interest to consensual liens simply reinforces a distinction that already exists in § 506(b). For the same reason, I find unavailing the Court's assertion, *ibid.*, that Congress would have used the phrase "security interest" if it wanted to limit postpetition interest to consensual liens.

Even if I believed that the language of § 506(b) were clearer than it is, I would disagree with the Court's conclu-sion, for *Midlantic* counsels against inferring congressional intent to change pre-Code bankruptcy law. At issue in *Mid-lantic* was § 554(a) of the Code, 11 U. S. C. § 554(a), which provided that "[a]fter notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value to the estate." De-spite this unequivocal language, the Court held that § 554(a) does not authorize a trustee to abandon hazardous property in contravention of a state statute or regulation reasonably designed to protect the public health or safety. Relying on only three pre-Code cases (one did not deal with state laws and in another the relevant language was arguably dicta), the Court concluded that under pre-Code bankruptcy law there

were restrictions on a trustee's power to abandon property. 474 U. S., at 500–501. The Court stated that the "normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific," and noted that it had "followed this rule with particular care in construing the scope of bankruptcy codifications." *Id.*, at 501 (citations omitted). Given the pre-Code law and Congress' goal of protecting the environment, the Court was "unwilling to assume that by enactment of § 554(a), Congress implicitly overturned longstanding restrictions on the common law abandonment power." *Id.*, at 506.

The Court characterizes *Midlantic* as involving "a situation where bankruptcy law, under the proposed interpretation, was in clear conflict with state or federal laws of great importance." *Ante*, at 245. Though I agree with that characterization, I think there is more to *Midlantic* than conflict with state or federal laws. Contrary to the Court's intimation, *Midlantic* did not "concer[n] statutory language which . . . was open to interpretation." *Ante*, at 245. The language of § 554(a) is "absolute in its terms," 474 U. S., at 509 (REHNQUIST, J., dissenting), and the Court in *Midlantic* did not attempt to argue otherwise. Nonetheless, the Court concluded that such clear language was insufficient to demonstrate specific congressional intent to change pre-Code law. The rule of *Midlantic* is that bankruptcy statutes will not be deemed to have changed pre-Code law unless there is some indication that Congress thought that it was effecting such a change. See *Kelly* v. *Robinson*, 479 U. S. 36, 50–51 (1986) ("Nowhere in the House and Senate Reports is there any indication that this language should be read so intrusively. . . . If Congress had intended, by § 523(a)(7) [of the Code] or by any other provision, to discharge state criminal sentences, 'we can be certain that there would have been hearings, testimony, and debate concerning consequences so wasteful, so inimical to purposes previously deemed important, and so

likely to arouse public outrage'") (quoting *TVA* v. *Hill*, 437 U. S. 153, 209 (1978) (Powell, J., dissenting)).

The first step under *Midlantic* is to ascertain whether there was an established pre-Code bankruptcy practice. See 474 U. S., at 500–501. That question is easily answered here. Prior to the 1978 enactment of the Code, this Court, as well as every Court of Appeals to address the question, had refused to allow postpetition interest on nonconsensual liens such as the tax lien involved in this case. See *City of New York* v. *Saper*, 336 U. S. 328, 329–341 (1949); *In re Kerber Packing Co.*, 276 F. 2d 245, 246–248 (CA7 1960); *United States* v. *Mighell*, 273 F. 2d 682, 684 (CA10 1959); *United States* v. *Bass*, 271 F. 2d 129, 130–132 (CA9 1959); *United States* v. *Harrington*, 269 F. 2d 719, 723 (CA4 1959). See also *In re Boston & Maine Corp.*, 719 F. 2d 493, 495–498 (CA1 1983) (post-Code case not allowing postpetition interest on municipal tax lien), cert. denied *sub nom. City of Cambridge* v. *Meserve*, 466 U. S. 938 (1984). In order to deflect this line of cases, the Court refers to the practice "of denying postpetition interest to the holders of nonconsensual liens, while allowing it to holders of consensual liens," as "an exception to an exception." *Ante*, at 246. Regardless of how it is labeled, cf. *Henneford* v. *Silas Mason Co.*, 300 U. S. 577, 586 (1937) ("Catch words and labels . . . are subject to the dangers that lurk in metaphors and symbols, and must be watched with circumspection lest they put us off our guard"), the practice was more widespread and more well established than the practice in *Midlantic*, and was certainly one that Congress "[would have been] aware of when enacting the Code." *Ante*, at 246.

The denial of postpetition interest on nonconsensual liens was based on the distinction between types of liens as well as equitable considerations. Unlike consensual liens, to which the parties voluntarily agree, nonconsensual liens depend for their existence only on legislative fiat. Thus, the justification for the allowance of postpetition interest on consensual

liens—"that when the creditor extended credit, he relied upon the particular security given as collateral to secure both the principal of the debt and interest until payment and, if the collateral is sufficient to pay him, the contract between the parties ought not be abrogated by bankruptcy," *United States* v. *Harrington*, 269 F. 2d, at 724—has no application to nonconsensual liens. The allowance of interest on nonconsensual liens is akin to a penalty on the debtor for the nonpayment of taxes or other monetary obligations imposed by law. Permitting postpetition interest on nonconsensual liens drains the pool of assets to the detriment of lower priority creditors who are not responsible for the debtor's inability to pay and who cannot avoid the imposition of postpetition interest. See *In re Boston & Maine Corp.*, 719 F. 2d, at 497. Indeed, the Court acknowledges that "the payment of postpetition interest is arguably somewhat in tension with the desirability of paying all creditors as uniformly as practicable." *Ante*, at 245–246.

The second step under *Midlantic* is to look for some indicia that Congress knew it was changing pre-Code law. See 474 U. S., at 502–505. As the Court said only last Term, "[I]t is most improbable that [a change in the existing bankruptcy rules] would have been made without even any mention in the legislative history." *United Savings Assn. of Texas* v. *Timbers of Inwood Forest Associates, Ltd.*, 484 U. S. 365, 380 (1988). The legislative history of § 506(b) is "wholly inconclusive," *Best Repair Co.* v. *United States*, 789 F. 2d 1080, 1082 (CA4 1986), and there is no statement in that history acknowledging that § 506(b) was to work a major change in pre-Code law. Because there is no evidence whatsoever that § 506(b) was meant to allow postpetition interest on nonconsensual liens, it should not be assumed that Congress "silently abrogated" the pre-Code law. *Kelly* v. *Robinson*, 479 U. S., at 47.

For the reasons set forth above, I respectfully dissent.