EASTERBROOK, Circuit Judge,
concurring in the judgment.
Courts of appeals have adopted two approaches to valuing a security interest in bankruptcy when the collateral is not going to be sold. Compare In re Rash, 90 F.3d 1036 (5th Cir.1996) (en banc), petition for certiorari pending under the name Associates Commercial Corp. v. Rash, No. 96-454 (filed Sept. 20, 1996) (wholesale value), with In re Taffi, 96 F.3d 1190 (9th Cir.1996) (en banc) (retail value). My colleagues endorse a third: the midpoint of the wholesale-retail range. I concur in the judgment, but only because the Trustee, representing the interests of the unsecured creditors, has not taken a cross-appeal.
Two elements of the majority’s analysis are convincing. First, we need a legal rule of decision. The Trustee’s anything-goes approach misunderstands what it means to say that judges decide case-by-case. They do not apply different rules of law to identical facts; instead they apply uniform rules of law to disparate sets of facts. Second, the Bankruptcy Code does not supply a rule of decision. It tells the court that a secured creditor prevented from recovering the property must receive, in exchange, payments equal to the value of the claim. 11 U.S.C. § 1325(a)(5)(B). How much is that? A secured creditor is entitled to “the value of such creditor’s interest in the estate’s interest in such property”, 11 U.S.C. § 506(a), which means “the value of the collateral,” United Savings Ass’n of Texas v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 372, 108 S.Ct. 626, 630-31, 98 L.Ed.2d 740 (1988), a rephrasing that still does not tell the court how to determine “value.”
*318 To obtain the missing standard we must turn, as so often in bankruptcy law, to the states’ definitions of property rights. Butner v. United States, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); BFP v. Resolution Trust Corp., 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994). Value may differ across categories of reorganizations and kinds of assets because the relevant non-bankruptcy entitlements and methods of quantifying value differ. This is the point of the second sentence of § 506(a). See Rash, 90 F.3d at 1045-51. Under the Uniform Commercial Code, which governs security interests in personal property such as automobiles (though not land or leaseholds), a security interest gives the creditor the right to seize and sell the collateral. See UCC §§ 9-502 to 9-505. When the non-bankruptcy entitlement is the power to sell at auction (or in another commercially reasonable way), then the secured portion of a claim is the net price the chattel would fetch at such a sale — in a word, wholesale. (An inter-dealer wholesale market in used cars involves some negotiated sales and some auctions; in this market, at least, the wholesale price and the normal outcome of a foreclosure auction are identical.) This standard of valuation does not depend on which chapter of the Bankruptcy Code applies, the identity or business of the creditor, or the likely outcome of private bargaining designed to avoid foreclosure. Neither state law nor § 506(a) refers to such matters.
A property interest is what a state court would respect if the dispute went to judgment. Threat positions often influence what people pay out of court, but we have it on high authority that these do not affect valuar tion in bankruptcy. Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 129-32, 60 S.Ct. 1, 13-15, 84 L.Ed. 110 (1939). Los Angeles Lumber holds that a credible threat to litigate and other negotiating strategies do not affect the value of a debt in bankruptcy, even if as a practical matter they alter the parties’ wealth outside of bankruptcy. This means that when estimating the value of a claim the judge should use an actual or hypothetical sale as the measure; the consumer surplus or going-concern value goes to the party entitled to it by contract or positive law, rather than to the party with the most bargaining power. My colleagues’ contrary conclusion, which establishes a standard of valuation different from the amount a state court would award to the secured creditor outside of bankruptcy, cannot be reconciled with Butner or Los Angeles Lumber. It is not sound to distinguish Los Angeles Lumber on the ground that the potential threat there was made by equity holders rather than debt holders. Equity and debt in a corporation create different sets of rights — though both of them are “ownership” interests — but these differences do not affect the question whether the likely outcome of a private bargain in the shadow of the law affects the standard of “value” that a court should use in a bankruptcy case.
Put security interests aside for a moment and consider the value of two commercial debts. Debtor owes Creditor A $500, and the expenses of obtaining a judgment and seizing assets to execute it are $1,000. Outside of bankruptcy this debt has little value; in a hypothetical bargaining game Debtor will refuse to pay, and Creditor A may bluff but in the end will not spend $1,000 to collect $500. If Debtor files a bankruptcy petition, however, Creditor A will submit a claim for $500, which will be recognized in full and be satisfied in the same proportion as other unsecured debts — even though these other debts may be worth more on the dollar outside bankruptcy. Creditor A’s non-bankruptcy entitlement is $500, which is the measure of the claim in bankruptcy. Now change the facts a little. Debtor owes Creditor B $500, and again the expenses of obtaining and collecting a judgment would be $1,000. But Creditor B is a long-term vendor to Debtor, and instead of threatening litigation Creditor B will threaten to cut off supplies essential to Debtor’s business. Debtor will pay up, even when other debts go unpaid. Bankruptcy law recognizes that this occurs but does not honor Creditor B’s leverage; instead the payment is apt to be called a preference and reversed under 11 U.S.C. § 547. See In re Tolona Pizza Products Corp., 3 F.3d 1029 (7th Cir.1993). Once again, the $500 debt will go into the pool with other unsecured debts, and each creditor will *319 receive an equal percentage of the claim. Yet Creditor B is much like the lender with a security interest in a car the debtor needs for work; the creditor has the debtor over a barrel and will use this in bargaining. (Indeed, there is little economic difference between security interests and mutual dependencies. See Oliver E. Williamson, Credible Commitments: Using Hostages to Support Exchange, 73 Am. Econ. Rev. 519 (1983); Lester Telser, A Theory of Self-Enforcing Agreements, 53 J. Bus. 27 (1980).) On the majority’s approach, Creditor B ought to receive $500 because this is the outcome of non-bankruptcy bargaining, while Creditor A gets nothing. Instead of aping the likely out-of-court payoff, however, the bankruptcy judge will treat the claims the same way a state court would: as of equal value.
Now consider a simple security interest in a case under Chapter 7. Debtor operates a restaurant, and the only secured creditor has a security interest in the restaurant’s oven. The debt to this creditor is $5,000; another $20,000 owed to remaining creditors is unsecured. The oven could be ripped out and sold at auction for $3,000; the retail price (including delivery and installation) of a used oven of identical quality is $5,000. Debtor’s assets will be sold and the pot of cash used to pay creditors. The building is worth more as a restaurant than as a dry goods store, so it will be sold intact; the trustee will not destroy the going-concern value. The building, contents, and goodwill fetch $15,000. Who gets how much? The norm under state law, and therefore under § 506(a), is that the secured creditor receives $3,000 for the security interest — the net price the oven would fetch in a hypothetical sale, without any element of the going-concern value being attributed to the oven — and is treated as an unsecured creditor for the remaining $2,000. See Dewsnup v. Timm, 502 U.S. 410, 414-15, 112 S.Ct. 773, 776-77, 116 L.Ed.2d 903 (1992); United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 239, 109 S.Ct. 1026, 1029, 103 L.Ed.2d 290 (1989); In re McClurkin, 31 F.3d 401 (6th Cir.1994). Thus $12,000 is available to distribute to creditors owed a total of $22,000. Each creditor receives about 55 percent of its claim. All told, the secured creditor gets $4,091 ($3,000 for the secured portion of the claim, plus 55 percent of the $2,000 unsecured portion) and the other creditors receive $10,909.
A thoroughgoing application of the majority’s approach, however, would treat the security interest in the oven as worth $4,000 — for that creditor, just like the bank with a security interest in a car, can bargain outside of bankruptcy in light of the holdup value the security interest confers. The premises and business are worth $15,000 with the oven in place and $10,000 without (the difference representing the cost of replacing the oven if the creditor hauls it away). The creditor won’t accept less than $3,000; the restaurateur won’t pay more than $5,000; the focal point of bargaining is $4,000. If the court treats the creditor as having a secured claim of $4,000, then $11,000 remains to apportion among holders of $21,000 in unsecured claims. Each receives a dividend of approximately 52 percent. The secured creditor obtains a total of $4,524 ($4,000 for the secured portion of the claim, plus 52.4 percent of the $1,000 unsecured portion) and the unsecured creditors receive $10,476.
Under Chapter 7 this hypothetical secured creditor receives $4,091 rather than $4,524. So much my colleagues concede. Does anything change if, in a reorganization under Chapter 11, the debtor never sells the restaurant, but continues to operate it? According to the Bankruptcy Code, the answer is no. In this reorganization the old stockholders will be wiped out, and the old creditors will become the new equity owners. Each former creditor receives securities according to the value of its claim — and the value of the secured creditor’s claim is limited by the ability of unsecured creditors to engineer a cramdown, under which the secured creditor gets what it would receive in Chapter 7. 11 U.S.C. § 1129(a)(7)(A)(ii). So the fact that there is no sale does not affect the creditors’ relative entitlements.
Now move to Chapter 13. Does anything change? The debtor in the Chapter 13 case keeps the asset, just as the debtor in a Chapter 11 reorganization does. Here the asset’s value (if it contributes to the debtor’s earnings) is converted to cash and distribuí- *320 ed to the creditors. A Chapter 13 debtor pays a stated percentage of income for a specified time. 11 U.S.C. §§ 1322(a)(1), (c), 1325(b)(1)(B). The present value of that payment stream is economically equivalent to the price at a sale of the debtor’s assets, and the real contestants in our case — just as in the restaurant hypothetical — are the secured and unsecured creditors. Each wants a larger fraction of the payment stream. Congress could create a special rule for bankruptcies under Chapter 13. It did so for home loans. 11 U.S.C. § 1322(b)(2); Nobelman v. American Savings Bank, 508 U.S. 824, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). It did not do so for automobile credit. Instead it reiterated the normal rule for valuing a secured creditor’s rights in a cramdown. 11 U.S.C. § 1325(a)(5)(B). We know what that is for a chattel covered by Article 9 of the UCC: the net price in a sale, which is to say wholesale value. The rest of the debt is unsecured and goes into the pot with other unsecured claims.
Opinions favoring retail value exude a belief that wholesale yields an unjustified wealth transfer to debtors who weasel out of their bargains, neither paying the agreed price nor surrendering the car, and then “charging” their creditors for the costs of a sale that does not occur. Under Chapter 13, however, the valuation of the secured claim has nothing to do with the question whether the debtor has paid too little for the assets retained. The judge requires the debtor to pay a portion of his income to the trustee, who apportions the receipts among creditors according to their entitlements. If the judge sets monthly payments or the number of months too low, or undervalues claims in the aggregate, there will be a wealth transfer in debtors’ favor, but the amount of the transfer is unrelated to the valuation of the secured portion of any given claim, which affects only the relative stakes of secured and unsecured debts. Valuation rules therefore should be identical across chapters.
Here’s another way to see the point that a security interest is worth the asset’s wholesale value even if the debtor keeps the collateral. Suppose the Bank foreclosed on the car outside of bankruptcy. Who would buy, and for how much? The parties stipulated that the wholesale value of the car was $3,325. My colleagues suppose, with good reason, that the car was worth more than that to the Hoskinses. So at auction (or any other commercially reasonable disposition) they would offer $3,326, which would prevail. No auto dealer would pay more; by hypothesis, dealers can get equivalent cars for $3,325. The Bank would not bid more, because a higher bid would reduce its deficiency judgment (the unsecured portion of the claim) without producing anything in return. Thus the ear would remain in the Hoskinses’ garage, and the secured portion of the Bank’s claim would be liquidated at the car’s wholesale value. All of this illustrates the point that, in competition, the highest-valuing user gets the property at a price representing its second-best deployment. See Van Zelst v. CIR, 100 F.3d 1259 (7th Cir.1996); R. Preston McAfee & John McMillan, Auctions and Bidding, 25 J. Econ. Lit. 699 (1987). The second-highest price plus a little extra carries the day; the highest-valuing user enjoys the rest of the value as consumer surplus. After the auction, the Hoskinses would remain liable for the deficiency judgment, and the Bank would stand in line with their other creditors. That is what a bankruptcy valuation is supposed to replicate, and the use of wholesale price does the job.