**In re ENRON CORP., et al.,
Reorganized Debtors.**

**No. 01 B 16034(AJG).**

United States Bankruptcy Court,
S.D. New York.

Sept. 21, 2005.

Cadwalader, Wickersham & Taft LLP, Edward A. Smith, Esq., of Counsel, New York, NY, for Reorganized Debtors.

Rubin & Rudman LLP, David Fixler, Esq., of Counsel, Boston, MA, for Taunton Municipal Lighting Plant LLP.

Kramer Levin Naftalis & Frankel LLP, Jack A. Hazan, Esq., of Counsel, New York, NY, for Taunton Municipal Lighting Plant LLP.

OPINION SUSTAINING DEBTORS' OBJECTION TO CLAIM FILED BY TAUNTON MUNICIPAL LIGHT-ING PLANT (CLAIM NO. 24494)

ARTHUR J. GONZALEZ, Bankruptcy Judge.

Commencing on December 2, 2001, and from time to time continuing thereafter,

Enron Corp. (the "Debtor") and certain of its affiliated entities, including Enron Power Marketing, Inc. ("EPMI"), (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On July 15, 2004, the Court entered an Order (the "Confirmation Order") confirming the Debtors' Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors (the "Plan") in these cases. The Plan became effective on November 17, 2004.

Taunton Municipal Lighting Plant (the "Claimant") is a Massachusetts municipal public power utility which is authorized by the Legislature of the Commonwealth of Massachusetts to provide electricity to consumers in the City of Taunton, Massachusetts and various surrounding towns. In that capacity, the Claimant entered into a Power Supply Agreement for Firm Entitlement/Strips, dated November 2, 2001 (the "Power Agreement") with EPMI. Pursuant to the Power Agreement, EPMI agreed to sell electricity to the Claimant from January 1, 2002 until December 31, 2007.

In accordance with the terms of the Power Agreement, the Claimant continued to purchase electricity from EPMI post-petition, during a period when the average electricity market prices were lower that the price set forth in the Power Agreement. As a result, the Claimant paid $567,216 more during the 2002 calendar year than it would have paid if purchasing electricity at the then-prevailing market prices.

During the Summer of 2002, EPMI and the Claimant entered into negotiations concerning the solicitation of new suppliers in an effort to enter into a new agreement for the supply of electricity and to replace the Power Agreement. In conjunction with the negotiations, EPMI and the Claimant solicited bids to sell electricity to the Claimant for the duration of the Power Agreement. However, the process did not result in any arrangement and EPMI continued to provide electricity under the Power Agreement. However, in December 2002, at a time when electricity prices continued to remain higher than the price set forth in the Power Agreement, EPMI rejected the contract. On December 17, 2002, the Debtors filed an Amended Notice of Rejection of Power Supply Agreement for Firm Entitlements with Taunton Municipal Lighting Plant (the "Rejection Notice"), in accordance with this Court's Amended Order Approving Procedures for the Rejection of Leases and Unexpired Leases From Time to Time in Furtherance of the Debtors' Reorganization Efforts, dated April 11, 2002. In accordance with the Rejection Notice, the effective date of rejection occurred on December 17, 2002, and EPMI did not deliver electricity to Taunton after December 31, 2002.

The Power Agreement provides that the non-defaulting party is to calculate its losses (the "Losses") or gains and its costs (the "Costs") and then to reduce those amounts to present value [1] as of a measur-

---

1.  Costs and Losses are defined in the Power Agreement as follows:

    *Costs shall mean, with respect to the non-defaulting party, brokerage fees, commissions and other similar third-party transaction costs and expenses reasonably incurred by such party ... in entering into new arrangements which replace the terminated transaction related only to this Agreement; and all*

*reasonable attorneys' fees and expenses incurred by the non-defaulting party.*

    . . .

*"Losses" shall mean, with respect to any party, an amount equal to the present value of the economic loss to it, if any (exclusive of Costs), resulting from the termination of the transaction only related to this Agreement, determined in a commercially reasonable*

ing date. To determine its Losses, the Claimant solicited bids to determine what actual suppliers in the relevant market would pay Taunton for power for the remainder of the contractual term. While it is Taunton's contention that the rejection date of the contract is the proper measurement point for rejection damages, Taunton selected February 11, 2003 as the measuring date for the calculation of damages. Taunton maintains that it was appropriate to select February 11, 2003 as the measuring date for the calculation of damages under the circumstances present where energy continued to be supplied even after the rejection date. Therefore, according to Taunton, February 11th was as close a date, to when deliveries ceased, as it could use for that type of "mark to market." As of the selected date for measure, the Claimant calculated that the net present value of the lowest price increase over the Power Agreement was $6,594,885.00 and that $64,000.00 was its "Costs." Thus, the Claimant seeks damages for the rejection of the Power Agreement in the amount of $6,658,885.00 (the "Rejection Damage Claim").[2] On November 24, 2003, Taunton filed a proof of claim for that amount in EPMI's bankruptcy case.

On February 16, 2005, the Debtors filed an objection to Taunton's Rejection Damage Claim. In their objection, the Debtors

argue that the valuation of any claim that Taunton may have for the rejection of the Power Agreement should be calculated as of the day before the date of the filing of the petition. The Debtors maintain that upon EPMI's rejection of the Power Agreement, it was deemed rejected as of the day immediately before the date that the petition was filed. The Debtors contend that any damages that stem from that rejection must also be fixed or determined as if the claim came into existence on the day immediately before the date that the petition was filed. The Debtors further argue that it is the value of the outstanding transactions under the Agreement as of the day before the petition date that is used to calculate rejection damages, not the "actual clearing price." The Debtors calculate that the forward value of the transactions under the Power Agreement on November 30, 2001, the first business day immediately preceding the petition date,[3] is $3.28 million in EPMI's favor[4] and that, therefore, Taunton's Rejection Damages Claim is $0. Thus, the Debtors maintain that as of the day before the date of the filing of the petition, Taunton's Rejection Damage Claim was $0 and it should be expunged.

The Claimant argues that although a contract that is rejected post-petition is deemed to be breached on the day immedi-

---

*manner in accord with the market value at the Delivery Point.*

2. Taunton also calculated its damages under an alternate section of the Power Agreement which resulted in a higher amount; however, pursuant to a settlement agreement, dated November 13, 2003, entered into by Taunton and EPMI, Taunton agreed to cap its claim at $6,658,883.00.

3. Inasmuch as December 2, 2001, the date that the petition was filed, was a Sunday and the markets were closed on that day, the Debtors utilized market information as of the first business day immediately preceding the

petition date, November 30, 2001, to calculate the value of the Agreement.

4. While Taunton argues that the Debtors have not correctly calculated the actual amount of damages, it does not dispute that, as of day before the date of the filing of the petition, EPMI was "in the money" with respect to the value of the outstanding transactions under the Power Agreement. Therefore, on the deemed rejection date, there were no losses by Taunton. Any calculation on that date under any article of the contract would not result in any damages being due.

ately before the date that the petition was filed, such breach does not completely terminate the contract. As such, the Claimant contends that damages based upon the parties continued performance under the contract should be calculated in accordance with the terms of the contract pursuant to which calculation of the damages would be determined on the date that EPMI rejected the contract and not the "deemed" rejection date. A hearing on this matter was held before the Court on June 9, 2005.

## DISCUSSION

■ Pursuant to section 365(g)(1) of the Bankruptcy Code, the rejection of an executory contract or unexpired lease, that has not previously been assumed by the debtor, "constitutes a breach of such contract or lease ... immediately before the date of the filing of the petition." Further, section 502(g) of the Bankruptcy Code provides that

> [a] claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

11 U.S.C. § 502(g).

In *In re American HomePatient, Inc.,* 414 F.3d 614, 618 (6th Cir.2005), the court concluded that the plain language of section 502(g) of the Bankruptcy Code requires that damages for rejection claims be fixed as of a date "before the date of the filing of the petition." The *American HomePatient* court reasoned that this was consistent with the language of the section which requires that the rejection claim be both *determined* and *allowed* as if the claim had arisen before the date of the filing of the petition. *Id.* The *American HomePatient* court rejected the contention that the only consequence of Bankruptcy Code section 502(g) was to classify a rejection claim as a pre-bankruptcy unsecured claim. *Id.* Rather, the *American HomePatient* court reasoned that if that were the only consequence intended, use of the two words, "determine" and "allow," would be unnecessary as that effect would be accomplished by the use solely of the term "allowed." *Id.* In its analysis, the *American HomePatient* court noted that one of the definitions of the term "determine" was "to fix the boundaries of." 414 F.3d at 618 (citing, *Merriam–Webster Online Dictionary,* at http://www.m-w.com). The *American HomePatient* court further noted that the term "allow" was defined to mean "permit." *Id.* Thus, the *American HomePatient* court concluded that "the word 'allow' would be sufficient to 'permit' a rejection damage claim to be classified as a pre-bankruptcy unsecured claim, and the word 'determine' would serve no apparent purpose whatever." *Id.*, at 618. Consequently the *American HomePatient* court determined that the inclusion of both terms in section 502(g) required that both be given effect and, consistent with section 365(g) of the Bankruptcy Code, the court concluded that the appropriate time to fix or determine damages was as of the time of the deemed breach—i.e., immediately before the date of the filing of the petition. *Id.*

The Claimant argues that the damages should be calculated in accordance with the terms of the contract as of the actual rejection date or as soon thereafter as feasible and then discounted to the day immediately preceding the filing of the petition.[5]

---

5. As the provisions of the Bankruptcy Abuse

Prevention and Consumer Protection Act of

In *Medical Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 386–87 (2d Cir.1997), the Second Circuit noted that while rejection is treated as a breach that qualifies for a remedy, such breach is not a complete termination of the contract. In *Lavigne*, a chapter 7 trustee did not assume or reject a doctor-debtor's malpractice insurance coverage within the statutory time permitted for such election. *Id.* at 382.[6] As a result, the insurance contract was deemed rejected. *Id.* at 387. The insurance contract included a provision that permitted a covered entity to purchase certain additional coverage within 60 days after the termination of the primary policy period that would extend the primary malpractice coverage benefits to claims asserted after the termination of the primary policy period to the extent of additional coverage purchased. *Id.* at 382. Within 60 days of the deemed-rejection date, the trustee sought to obtain that additional coverage. *Id.* The insurance company countered that the trustee's request was time barred because the rejection of the contract related back to the date immediately prior to the filing of the petition and the trustee's request was more than 60 days after the filing of the petition. *Id.* The Second Circuit concluded that while rejection is treated as a breach, the contract itself is not completely terminated. *Id.* at 386–87. The Second Circuit determined that the rejection merely relieves the estate of the obligation to perform but that the contract does not disappear. *Id.* at 387. Further, the Court concluded that not all contract obligations are terminated. *Id.* at 387. The Second Circuit reasoned that the debtor's obligations under the contract were unaffected and provided the basis for a claim that would be treated as a pre-petition claim for purposes of its priority. *Id.* at 387. However, the Second Circuit concluded that the parties rights under the contract and its breach were not determined by the Bankruptcy Code. *Id.* at 387. Rather, the court looked to state law to determine the parties rights under the contract. *Id.* With respect to the insurance contract, the Court determined that while it was considered breached as of the date immediately prior to the filing of the petitions, the contract terminated when it was deemed rejected upon the trustee's failure to assume or reject it within the statutory period. *Id.* As a result, the trustee's request for extended coverage was timely. *Id.*

The Claimant contends that in accordance with Second Circuit precedent, the rejection damages must be determined under state law and pursuant to the terms of the Power Agreement and that the relevant date for calculating its rejection damages is the date the Debtors actually rejected the contract or stopped performing under the contract and as soon thereafter as a mark to market analysis can be performed.

---

2005 only apply to cases filed after October 17, 2005 and, therefore, do not have application to this matter, the Court does not address Taunton's arguments with respect to those provisions. Moreover, any provisions contained in the new legislation would not be dispositive as to the state of the law prior to the adoption of the new provision, as such provision could equally evidence amendments to a prior-contrary law or clarification of a prior-consistent law.

6. Section 365(d)(1) of the Bankruptcy Code provides that

> [i]n a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such contract or lease is deemed rejected.

■ However, it is only necessary to look to state law when there is a "gap" in federal bankruptcy law. *American Home-Patient*, 414 F.3d at 620. Where, however, "the Bankruptcy Code specifically fixes the date of breach for rejection damages purposes as the date immediately before the date of the filing of a bankruptcy petition" and "also specifically provides that any claim arising from a rejection shall be 'determined' as if such claim had arisen before the date of the filing of the bankruptcy petition," there is no "gap" and the Bankruptcy Code provisions control in relation to conflicting provisions of state law. *American HomePatient*, 414 F.3d at 620. Therefore, the provisions of the Bankruptcy Code control the timing of the fixing of the boundaries of the rejection claim irrespective of state law or the terms of the contract.[7]

In *Lavigne,* the Second Circuit looked to state law to determine when the contract terminated for the purpose of selecting the appropriate date from which to calculate the period for electing the option to purchase additional coverage benefits. There is no provision in the Bankruptcy Code that specifically addresses the issue of the commencement date for the running of a contractual limitations period. As the parties' contract was not completely terminated upon its deemed breach, it was appropriate to look to state law to determine the relevant date from which to commence to count the option period. This is distinct from determining a damage claim stemming from a rejected contract where the Bankruptcy Code does not have a gap as it contains specific direction concerning the time frame at which to allow and fix the

boundaries of such claim. The Bankruptcy Code specifically provides that a rejection claims is to "be determined [and] allowed ... the same as if such claim had arisen before the date of the filing of the petition."

Moreover, determining the amount of damages as of the petition date is consistent with the historical fiction that a debtor's affairs are to be wound up as if settled on the date of the petition with all of the debtor's assets ratably distributed on that date. *Addison v. Langston (In re Brints Cotton Marketing, Inc.),* 737 F.2d 1338, 1342 (5th Cir.1987) (citing, *Sexton v. Dreyfus,* 219 U.S. 339, 344–45, 31 S.Ct. 256, 55 L.Ed. 244 (1911)). Further, determining the damage claim as of the petition date is perceived as providing both the fairest treatment to similarly situated creditors and the most administratively efficient method to calculate the various claims. *Brints,* 737 F.2d at 1342.

The Claimant argues that by statute and regulatory requirements, its contracts must provide power that is competitively priced, economically superior to other alternatives, saves ratepayers' money, and contain provisions to protect the ratepayers. The Claimant maintains that because it is a governmental entity and does not qualify as a forward contract merchant that would be authorized by section 556 of the Bankruptcy Code to terminate the Power Agreement notwithstanding the bankruptcy filing, equitable considerations favor its position and it should not be deprived of the opportunity to maximize its recovery.[8] In essence, the Claimant is

---

7. The Claimant argues that under Article 10 of the Power Agreement, it is permitted to calculate the damages at any time after the counter-party's failure to deliver power. Upon the rejection of a contract in bankruptcy, however, the Bankruptcy Code preempts any such provision and requires that the damages be determined for damage assessment purposes as if the claim had arisen before the date of the filing of the petition.

8. The Claimant maintains that it was inequitable for it to have had to continue to pur-

seeking to achieve, through equity, the statutory protections Congress limited to, among others, a forward contract merchant.

While the provisions of the Bankruptcy Code preclude the Claimant from terminating the Power Contract unilaterally, the Bankruptcy Code provides a mechanism for an entity to seek a determination concerning an executory contract. Although a debtor in a chapter 11 case is afforded an opportunity to make a determination concerning assumption or rejection of an executory contract until confirmation of a plan of reorganization, the non-debtor party may seek to reduce the time within which the debtor must make such election by filing a motion seeking to compel the debtor to make a determination concerning assumption or rejection of the contract within a specified period of time.[9] *See In re Enron Corp.*, 279 B.R. 695 (Bankr. S.D.N.Y.2002) (noting that "[u]nder § 365(d)(2), any party to an executory contract may request that the court fix a time within which the debtor must assume or reject an executory contract.") *In re Enron Corp.*, 279 B.R. 695 (Bankr.S.D.N.Y. 2002).[10]

■ Finally, the Court must apply the plain meaning of a statute unless such

---

chase electricity from EPMI post-petition and pay the price set forth in the Power Agreement during a period when it was higher than the prevailing market price.

9. Section 365(d)(2) of the Bankruptcy Code provides that
[i]n a case under chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor at any time before the confirmation of a plan but the court, on request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.

10. In fixing the time for a debtor to assume or reject a contract, the standard applied by the court is whether a debtor has been afforded a reasonable time within which to make its determination on assumption or rejection of the contract. *Enron Corp.*, 279 B.R. at 702. The decision as to whether a reasonable time has been afforded is within the court's discretion as considered under the facts of the particular case. *Id.* The factors considered by a court in reaching its conclusion include (1) the damage the non-debtor will suffer beyond the compensation available under the Bankruptcy Code; (2) the importance of the contract to the debtor's business and reorganization; (3) whether the debtor has had sufficient time to appraise its financial situation and the potential value of its assets in formulating a plan; and (4) whether exclusivity has terminated. *Id.* at 702–03 (citing *Theatre Holding Corp. v. Mauro*, 681 F.2d 102, 105–06 (2d Cir.1982)). In addition, a court must consider the complexity of the case, including the number of contracts to be evaluated, and the need for a court to determine the validity of the contract. *Id.* at 703 (citing *South Street Seaport Ltd. P'ship v. Burger Boys, Inc. (In re Burger Boys, Inc.)*, 94 F.3d 755, 761 (2d Cir.1996)).

Regarding factor (1), the difference in the damages calculation resulting from its being determined at the deemed rejection date, instead of the actual rejection, is the type of non-debtor damages that arguably would be considered as not compensated by the bankruptcy code in determining whether such factor, in conjunction with the other factors, may warrant setting a specific time within which the debtor would have to assume or reject a particular executory contract. While consideration of factor (1) may be outweighed by some or all of the other factors, especially at the early stages of a complex case; seeking to compel an election by a debtor as to its intent concerning assumption or rejection of a contract is the only remedy available to a non-debtor, counter-party to an executory contract that is not otherwise protected by another section of the Bankruptcy Code. Congress chose to otherwise protect certain parties, including forward contract merchants, in the "safe harbor" provisions but did not include a party such as the Claimant within the ambit of the protection afforded there. It is not the role of this Court to expand those provisions to include such non-covered parties.

application would "produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enters.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989). Here, the fact that EPMI's bankruptcy filing alters or preempts the Claimant's rights under the contract is a reflection of the overall policy rationale of the Bankruptcy Code and not a justification for ignoring the plain language of the provision. Absent a showing that it produces a "result demonstrably at odds with the intentions of its drafters," there is no basis to ignore the plain language of the Code. No such showing has been established here.

The Debtors' Objection to the proof of claim filed by the Claimant is sustained.

The Debtors' counsel is to settle an order consistent with this Opinion.