MAGILL, Circuit Judge, dissenting.
Because I find that the statute here is far from clear and the Chief’s decision constitutes a reasonable interpretation of the congressional mandate, I respectfully dissent.
The facts are adequately set out in the majority opinion. Review of agency interpretations of statutes requires courts to apply the two-pronged test set forth in Chevron U.S.A., Inc. v. National Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The majority sets out the proper standard:
We must first determine ‘whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.’ If the statute is silent or ambiguous, we may only review the agency’s action to determine whether that action ‘is based on a permissible construction of the statute.’
Maj. op. at 1486 (citing Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781).
The majority fails, however, in its application of this standard. The court’s charge under prong one of Chevron is to interpret the language of the statute and determine congressional-intent, using the traditional tools of statutory interpretation. Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9. According to the Supreme Court, statutory interpretation begins with examination of the statutory text. See, e.g., United States v. Ron Pair Enters., Inc., 489 U.S. 235, 240, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). If that text is clear, resort even to legislative history is unnecessary. Id.
Here, then, the question under prong one of Chevron should be whether Congress clearly intended that feasible nonmotorized means meant any “physically possible” alternative means. I contend that a fair *1490 reading of the statutory text and legislative history demonstrate it did not.
Section 4(g) of the Boundary Waters Canoe Area Wilderness Act provides:
Nothing in this Act shall be deemed to require the termination of the existing operation of motor vehicles to assist in the transportation of boats across the [Prairie Portage, Four Mile Portage, and Trout Lake Portage] during the period ending January 1, 1984. Following said date, unless the Secretary determines that there is no feasible nonmotorized means of transporting boats across the portages to reach the lakes previously served by the portages listed above, he shall terminate all such motorized use of each portage listed above.
Boundary Waters Canoe Area Wilderness Act of 1978, Pub.L. 95-495, § 4(g), 91 Stat. 1649, 1651 (1978) (emphasis added). This court recognizes, correctly, that “feasible” can support the meanings proffered by both appellants and appellees.[1] It then proceeds to hold that § 4(g) demonstrates on its face, without resort to legislative history, a clear congressional intent that feasible means physically possible.
To reach this conclusion, the court accepts appellant’s contention that “feasible” is a term of art with a commonly accepted meaning in environmental statutes, and that Congress intended that meaning in § 4(g). Courts often look to other statutes as a guide to statutory meaning. Such inquiry, however, is always an effort to determine congressional intent. Here, it appears that the court has blindly adopted the definition of “feasible” from other statutes without considering whether Congress intended to adopt that definition.
First, the court provides no evidence from either the statutory text or the legislative history to suggest that Congress adopted the definition of “feasible” in other statutes into § 4(g). Thorough inquiry convinces me that none exists.[2] Moreover, the statutes cited as establishing the “accepted” definition of feasible are inapposite. They all deal with engineering or technological capabilities, while § 4(g) requires the Forest Service to determine whether human beings have the physical capacity to traverse the portages in question. Because the statutes do not concern analogous subjects, there is no reason to believe, without some specific indication, that Congress adopted such an inapt definition.
Without the inapt definition of “feasible” imported from other statutes, § 4(g) does not directly answer how the Forest Service is to determine the feasibility of alternative means. Because I find the plain language of the statute ambiguous, I must examine the legislative history. It likewise provides little help.
As noted above, I find no legislative history explicitly considering whether Congress used feasible to mean “physically possible.” There exists, however, some history concerning the “feasibility” of portage wheels. Appellants, and this court, cite at length from the floor statements of Rep. Burton, the House sponsor. Rep. Burton stated, after conference, that, inter alia, “feasible non-motorized means” existed at the time of the bill’s consideration. Speaking about portage wheels, he stated: “This method is feasible and proven, and I would expect that the Secretary will terminate motorized use of these portages and permit that method to be used.” 124 Cong. Rec. H13,438 (daily ed. Oct. 14, 1978).
*1491 There are two reasons to be wary of this statement. First, it is the statement of one who, while not a dissenter, did not get what he wanted in the revised bill after conference. The bill championed by Rep. Burton and passed by the House would have closed all motorized portages immediately. It appears that Rep. Burton attempted to write into the legislative history what he could not write into the law. See In re Sinclair, 870 F.2d 1340 (7th Cir.1989) (Easterbrook, J.). Second, the compromise reached suggests that Congress did not believe feasible means, as defined in § 4(g), existed in 1978. Rep. Burton’s statements seem to imply that the statutory deal simply provided a six-year phase out period for the four named portages. But if that is what Congress intended, they much more easily could have stated that “as of January 1, 1984, the following portages shall terminate.” Instead, Congress directed an executive agency to interpret an ambiguous statutory term and to determine at the end of the six-year period whether the portages should remain open. In the face of such evidence, we would be blind to the realities of the legislative process if we took Rep. Burton’s words to be an objective, unbiased statement of the Congress’ intent in enacting § 4(g).
Because neither the statutory text nor the legislative history provides credible evidence of a clear legislative intent concerning the definition of the term “feasible,” I must reach prong two of Chevron: “whether the agency’s answer is based upon a permissible construction of the statute.” Chevron, 467 U.S. at 843, 104 S.Ct. at 2782. In prong two, courts properly consider whether the agency’s action or interpretation is reasonable in view of the statute’s purposes. In this case, we must measure the Forest Service’s decision in that context.
The court correctly recognizes that one of Congress’ overarching goals in enacting the BWCAW Act. was to discourage motorized use. In assessing the feasibility of alternative nonmotorized means, the Chief recognized, however, that Congress intended motorized use to continue on the lakes serviced by the portages in question. Senator Wendell Anderson of Minnesota stated:
The bill passed by the House attempted to give wilderness protection to this unique area while still providing for a continuation of limited motorized use. This area is a prized area for sports enthusiasts and fishermen of all kinds. Many small resorts have flourished surrounding these beautiful lakes. In order to protect these businesses and to continue to allow sport fishermen to fish these prize trout and walleye" lakes, I have worked to amend the House version of this bill to provide motorized use on a greater number of lakes. In almost every case lakes necessary for a-resort to maintain its business have been kept open for the use of small motors.
Statement of Senator Wendell Anderson, 124 Cong.Rec. S.17889 (daily ed. Oct. 9, 1978). Thus, we must balance thése contradictory intentions. I believe that absent more, the specific must trump the general. The legislative intent to allow motorized use on the lakes serviced by these portages belies a congressional desire to place limits upon access to those lakes that would exclude many who were using them at the time the law was passed.
When viewed in this context, the Chief's decision that no feasible nonmotorized means existed is reasonable and consistent with the statute. First, the tests the Forest Service conducted were consistent with the statute. Recognizing the congressional desire to continue motorized use on these lakes, the Forest Service attempted to determine the average user of these portages, and to tailor its tests to mirror that use. Portage Report at 5-7; Determination of Feasibility for Three Motorized Portages Within the Boundary Waters Canoe Area Wilderness, Oct. 11, 1989, (hereinafter Determination) at 2. The Forest Service attempted to determine whether feasible means other than portage wheels existed; however, appellants insisted that only portage wheels be tested. Determination at 2. It also considered the use of alternative routes for some of the portages, but discov *1492 ered that other provisions of the Act prohibited such use. Determination at 4.[3]
The Chiefs conclusion following these tests, that no feasible nonmotorized means existed, is likewise reasonable and consistent with, the statute.' Although 76% of those who attempted the portages during the test completed them successfully, the Chief determined that they exerted significantly more, effort than the average portage user because of the media coverage and the air of competition’ surrounding the tests. Determination at 4-5. A physiological study determined that the test participants, who tested considerably above the national average for cardiovascular fitness, worked to near physical capacity in completing the portages. Determination at 4-5. The physiologist who reviewed the tests stated that:
The manual portaging of these boats on the available portage wheels is a task that required high levels of sustained physical effort and, in the case of the Four Mile Portage, marathon-like endurance performance. The data suggests that the level of effort and endurance required would not normally be achievable by people who are in “normal” physical condition for their age and gender. The excellent physical condition of the subjects tested contributed highly to their ability to complete the required tasks.
Portage Report, App. G; Determination at 4-5. Based upon congressional intent to continue motorized use of these lakes, it was reasonable for the Chief to consider the physical effects on people in “normal” physical condition when making his decision.
The feasibility report submitted to the Chief noted other safety concerns that support the reasonableness of his decision. The report concluded that the test provided a somewhat idealized situation. Many using portage wheels would" not have the same training or take the same safety precautions as the test participants. Those using the portages may have spent several days in the Boundary Waters and may be fatigued or dehydrated and thus more susceptible to injury. Portage Report at 21. The tests also did not approximate the normal use of the portages, in which people pass each other and must keep adequate distance between boats. Id. Finally, the report raised concerns about the condition of the portages deteriorating and leading to safety problems once motorized use ceased. Id. at 21; Determination at 3. The Chief reasonably considered the impact of normal use of the portages, and not just the results from an idealized test situation, in making his decision.
Appellants challenge the Chiefs consideration of safety concerns in making his determination, contending that the statutory term “feasible” does not allow such considerations. For this proposition, appellants cite the Supreme Court’s decision in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In Overton Park, the Court held that the Secretary could not engage in a wide ranging balancing of factors, including safety considerations, to conclude whether another highway route was “prudent.” This reliance is inapposite. First, Overton Park does not stand for the proposition that safety considerations were irrelevant to the decision involved therein. It would border on ridiculous to suggest that the safety of those using a highway could not be considered in determining, as the Court required, whether use of a particular highway route is “feasible” as. a “matter of sound engineering.” The Court merely intended that the Secretary not engage in ad hoc balancing of the relative merits of the particular routes.
Moreover, Overton Park is irrelevant to this situation. The choice of an alternative *1493 route for a highway will create no specific safety concerns independent of those subsumed in an analysis of sound engineering practice. That is not true in this case. The level of physical exertion required to complete these portages directly relates to the health and safety of those using them. In light of congressional intent to keep these lakes open for use by sports fishermen using motorboats, it is imminently reasonable for the administrative decisionmaker to consider the effect on the health of the people likely to be affected. “Feasibility,” in light of all the circumstances, should not be construed to create an unreasonable risk for those who Congress intended could continue to use the lakes in question.[4]
Because Congress did not explicitly define “feasible nonmotorized means,” I would defer to the Forest Service’s reasonable decision. This conclusion does not imply a lack of respect for the legislative branch; instead, I believe it fosters respect. If Congress clearly directs, we judges will follow. Here, however, it appears that Congress decided not to decide the status of these portages, and left that decision to the agency. By deferring to the agency, we respect that congressional decision. Moreover, by leaving policy decisions to the politically accountable agencies rather than the judiciary, we foster democratic accountability. I respectfully dissent.

. Commentators have suggested that "feasible” is a term Congress often uses to grant administrative discretion. See, e.g., Laurence H. Silberman, Chevron — The Intersection of Law and Policy, 58 Geo.Wash.L.Rev. 821, 823, 825 (1991) (“Finding a specific congressional intent is particularly unlikely if the agency is applying statutory language that calls for administrative judgment, such as what is ‘feasible’ or ‘probable.’ ”); Cass R. Sunstein, Interpreting Statutes in the Regulatory State, 103 Harv.L.Rev. 405, 419 (1990).

. While the floor statements of Rep. Burton suggest that the Forest Service should consider portage wheels to be presumptively “feasible" means, he says nothing specifically about whether Congress adopted the definition of “feasible” from other environmental statutes. Moreover, there are persuasive reasons to distrust Rep. Burton’s statements concerning congressional intent.

. The BWCAW Act put limits on motorized use on the lakes where it was still allowed. The alternative routes appellants suggested for the Four Mile Portage would not be feasible because, as th.e Chief found, "motorized use of Newton Lake and Pipestone Bay would exceed the quota limits established in the BWCA Wilderness Act if use from the Four Mile Portage were diverted to this area.” Determination at 4.

. Appellants also contend that the Forest Service’s safety conclusions were flawed because it failed to compare the exertion required to complete other portages in the Boundary Waters. This argument fails. First, such a consideration would be relevant only if one could assume that all other factors were equal, i.e., the type of equipment portaged and the physical fitness of those using the portage. Second, Congress did not direct the Forest Service to make such a comparison.