Judgment rendered September 21, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,474-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

| | |
|---|---|
| T. SCOTT PERNICI, MICHAEL JONES, AND MARK DEFATTA, INDIVIDUALLY AND ON BEHALF OF A CLASS OF SIMILARLY SITUATED PERSONS | Plaintiffs-Appellees |
| versus | |
| CITY OF SHREVEPORT, LOUISIANA | Defendant-Appellant |

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 599,698

Honorable Michael A. Pitman, Judge

* * * * *

| | |
|---|---|
| PETTIETTE, ARMAND, DUNKELMAN, WOODLEY, BYRD & CROMWELL, L.L.P. By: Joseph S. Woodley Edwin H. Byrd, III Marshall L. Perkins | Counsel for Appellant |
| HARPER LAW FIRM, APLC By: Jerald R. Harper Anne E. Wilkes | Counsel for Appellees |

* * * * *

Before MOORE, THOMPSON, and MARCOTTE, JJ.

**MARCOTTE, J.**

This appeal arises from the First Judicial District Court, Caddo Parish, the Honorable Michael Pitman presiding. Defendant, the City of Shreveport, appeals the trial court's June 28, 2021, partial final judgment. For the following reasons, we reverse.

On March 29, 2017, plaintiffs T. Scott Pernici, Michael Jones, Mark DeFatta, and others similarly situated ("plaintiffs"), approximately 65,000 people, filed a class action petition for the recovery of overpayment of water and sewerage charges by and from defendant, the City of Shreveport, Louisiana ("the City"). Plaintiffs consisted of persons who: (1) were current or former residents of the City and/or Caddo Parish from March 29, 2007, (2) were or are residential customers of City water and sewerage services from March 29, 2007 to the present; (3) were, between March 29, 2007 and the present, subject to paying residential sewerage service charges under Shreveport, La., Ordinance § 94-165(2)(a) (1994), (the "Ordinance"); and (4) were overcharged for their residential sewerage usage and/or service charges as a result of the City's failure to properly compute their customers' average monthly water usage in compliance with the Ordinance.[1]

The Ordinance stated during the relevant time period:

Quantity charges for metered residential customers shall be based on 100 percent of water consumption unless the individual customer's average monthly water usage is less for the months of November, December, January and February, calculated after the month with the highest metered water usage and the month with the lowest metered usage have been eliminated.

---

[1] Plaintiffs filed supplemental and amended class action petitions which further specified the class, accounted for additional damages to the class as a result of the City continuing to use "unlawful" billing methods, and added additional causes of action detailed below.

More specifically, plaintiffs stated that the City failed to properly compute average winter consumption ("AWC") for residential sewerage usage based on the formula provided in the Ordinance. Plaintiffs alleged that their water and sewer bills were consistently inaccurate and that customers inside the city limits had been charged at most $31.48 more monthly, while customers outside the city limits had been charged up to $62.94 more monthly.

Plaintiffs stated that the designated winter months of November, December, January, and February have a total of 120 days, except in a leap year when the total number of days is 121. Plaintiffs explained that the water usage for those four winter months is used to determine the AWC under the Ordinance, and that the average is used, starting the next succeeding May of each year, as the customer's sewerage rate for each of the following 12 months unless the customer's actual water usage in any given month is less than the AWC. In that case, the customer is billed a sewerage rate based on the actual water usage in that month. The rationale for calculating sewerage rates in such a manner is that the water used in hotter, dryer months for irrigation purposes does not enter the sewerage system and does not require processing by the City; thus, it is eliminated from customers' water bills.

Plaintiffs stated that the City used an excessive number of days in computing customers' AWC. Plaintiffs contended that as far back as 2007, the City used numbers in excess of 120 days (121 in a leap year) to calculate customers' AWC and sewerage rates. The inclusion of extra days in one or more of the four winter months sometimes created false high consumption months which resulted in an inaccurate, higher AWC number.

Plaintiffs complained that the City used days in computing the AWC that were not included in the four winter months delineated in the Ordinance, while excluding days that should have been included. Plaintiffs stated that the City used November water bills in its AWC calculation that included water usage for all or part of October, and it used February water bills in its AWC calculation that did not reflect all of the water consumed by a particular residence in February. Plaintiffs argued that water consumption for October was not enumerated in the Ordinance and water consumption for all of February was supposed to be included in the AWC calculation. Plaintiffs claimed this led to overcharges in customers' AWC calculations.

In calculating the AWC, the City discounted the two winter months with the highest and lowest water usage, averaged the usage for the two remaining months, and then rounded that figure up to the nearest whole thousand gallons. Plaintiffs complained that since at least 2007, the City improperly truncated its monthly water consumption to the nearest whole thousand gallons and did not use 100 percent of the actual water consumed in calculating the AWC. Plaintiffs acknowledged that the City's ordinances "may be read" to permit the City to bill residential customers per 1,000 gallons of water used, but plaintiffs also claimed the City did not have authority to round the AWC up to the nearest whole thousand gallons.

Plaintiffs stated that this resulted in sewerage rate overcharges to a significant percentage of its residential customers. Plaintiffs claimed that the residential water meters the City utilizes have the capacity to account for water usage to the gallon and truncating and/or rounding is not necessary. Plaintiffs also raised claims of overbilling for those residential customers

3

who have older hundred cubic feet meters to track their water usage, which are different from newer meters which measure water usage in gallons

Plaintiffs also brought claims for breach of contract, unjust enrichment, payment of a thing not due, and a request for a declaratory judgment that plaintiffs have a right to offset their future water bills with any damages the court deemed they were owed due to their claims. Plaintiffs asked for a permanent injunction prohibiting the City from (1) using in excess of 120 days of actual water consumption in determining customers' AWC; (2) using water consumption from any days not falling in November, December, January, and February in calculating customers' AWC; and/or (3) from truncating and/or rounding up in computing customers' AWC.

Plaintiffs also requested a permanent injunction to prevent the City from turning off water services of residents for failure to pay for water and sewerage services. Plaintiffs asked for a writ of mandamus directing the City to set sewer rates in accordance with the Ordinance. Plaintiffs sought a customer-by-customer accounting in order to determine the identity of residential customers and the amounts they were each overbilled or underbilled, as well as damages, fees, and costs. The City answered the petitions and denied all claims.

The trial court ultimately divided the classes into two sub-classes: (1) the "rounding" subclass, which included class members who were overcharged for sewerage when their AWC was calculated which resulted from the City's practice of ("after 'truncating' when reading the meter and only reading the 'thousands' of gallons") by rounding up to the nearest "whole thousand gallons," and using that rounded amount to calculate customers' sewerage charges; and (2) the "days-months" sub-class, which

4

included class members who were overcharged for sewerage when their AWC was calculated by utilizing an amount of days in excess of 120 (121 in a leap year) and/or the class members' AWC was calculated by using days that were not in the months of November, December, January, and February.[2]

On May 3, 2019, plaintiffs filed a motion for partial summary judgment on the issue of liability. In their motion, plaintiffs argued that there were no disputed issues of material fact, that the City had acknowledged its billing practices, and that the only issue to be decided by the court was a matter of statutory interpretation, an issue of law. Plaintiffs argued that the use of the City's methods was an intentional effort by the City to generate greater revenue.

More precisely, plaintiffs argued that the Ordinance is unambiguous. Plaintiffs asserted that the Ordinance provides that the charges will be based on the customer's "water consumption," which is understood to mean the actual amount of water consumed, which is better understood by the phrase "100 percent." Additionally, plaintiffs argued that the meaning of the word "month" is clear and unambiguous, as well as the meanings of "November," "December," "January," and "February," respectively. Thus, they argued that because the Ordinance only provides for AWC water consumption to be calculated in the four designated months, there could be no other meaning. Plaintiffs surmised that the Ordinance intended for the AWC to be calculated from 100 percent of water actually consumed in November, December,

_____

[2] The parties later settled plaintiffs' claims related to rounding, and those claims are not at issue in this appeal.

January, and February. Those months only account for 120 days (121 in a leap year).

Plaintiffs further argued that the Ordinance's AWC calculation did not include water consumption during the "billing cycles" of those months, which would include both October and March, and neither did it include discretionary days. Plaintiffs alleged that the word "average" means to add the two middle months and divide them by two. Plaintiffs concluded that because the statute is unambiguous, the City's interpretation is irrelevant and inapplicable. Plaintiffs lastly argued that even if the City's interpretation were given great weight, it still fails. Plaintiffs asked the court to enter a judgment in their favor as to liability.

On July 31, 2019, the City filed its own motion for summary judgment.[3] The City detailed the process by which residential water meters are read and customers are then billed. The City stated that its code of ordinances provides authority for the Department of Water and Sewerage ("DOWAS") to promulgate rules (the "Rules") for the method and timing of water meter reading. The City uses water meters to measure water consumption, but meters are not available to measure sewer consumption, the portion of the water used that enters the sewer and is processed. Because of that, sewer consumption is based on water consumption.

For the purposes of measuring water consumption and determining sewerage charges, the City is divided into 19 geographic billing cycles, which are further divided into 10 to 13 routes per cycle. Each route has up

---

[3] The parties made several filings in opposition to opposing parties' motions and in support of their own motions, making arguments similar to those made in their respective motions for summary judgment.

6

to 550 active and inactive meters. The meters are read manually and in sequence by a private company, which, according to the Rules, is required to read at least one cycle per day. Meters in each cycle are to be read and billed approximately once each month, but in no case more than 12 times a year.

The water meters measure in gallons, but the City utilizes thousand-gallon increments, and does not read or bill to the single gallon. Therefore, whether a customer uses 1,100 gallons or 1,900 gallons, the customer is charged for 1,000 gallons of water usage and his or her sewerage charges are calculated based on that whole thousand gallons number. Only the thousands' place displayed on the meter is recorded, and the increase from the thousands' place from the last meter reading is what constitutes the metered water consumption for the applicable billing period.

The City argued that the Ordinance and Rules do not reference "calendar months," but rather billing cycles. The City contended that the Rules contemplate one meter reading approximately once per month, and not on the same day for everyone in the City. The City argued that the Ordinance must be read *in pari materia* with its other laws, which demonstrates that a requirement cannot be in place to read meters on a precise calendar month basis. Such a result would be inconsistent with the Rules setting forth that all meters are read sequentially on different days in the 19 regions, and only 12 times per year. The City stated that in order for all of the City's residential meters to be read on the first and last day of each calendar month, "an army of meter readers would be required."

Plaintiffs replied to the opposition and argued that the Rules promulgated by DOWAS do not have the same authority as the Ordinance,

7

which was legislatively enacted. Plaintiffs again asserted that because the City did not dispute that its practice did not comply with the plain language of the Ordinance, the matter should be concluded.

On September 3, 2019, a hearing on the cross-motions for summary judgment was held. No new arguments were raised. Both sides acknowledged that there were no material facts at issue and the matters for the trial court to determine were solely questions of law.

On October 14, 2019, a second hearing on the cross-motions for summary judgment was held in order for the City to answer the trial court's question regarding the rounding issue. Following arguments, the trial court stated, regarding the days-months issue:

> With regard to the other issue, the Ordinance clearly shows that quantity charges for metered residential customers shall be based on a 100 percent of water consumption, unless the individual customers average monthly water usage is less for the months of November, December, January, and February, emphasize those four months, calculated after the months with the highest metered water usage have been eliminated, period. As plaintiffs have pointed out, that the City is actually using October and March in those calculations as well, something that the Ordinance does not provide for.

On November 26, 2019, the trial court signed a judgment granting plaintiffs' motion for partial summary judgment on liability and denying the City's motion for summary judgment. The City sought supervisory review with this Court, which was denied.

On October 20-21, 2020, a bench trial was held on the quantum of damages on the days-months issue.[4] Plaintiffs called an expert witness, Ronald Gagnet ("Gagnet"), over the City's objection. Gagnet was accepted

---

[4] On November 23, 2020, the trial court signed an order granting final approval of a partial class action settlement. The scope of the settlement included resolution of only the rounding issue. The parties reserved the days-months and truncation issues for future litigation.

as an expert in certified public accounting, certified financial forensics, and damages calculations. Plaintiffs submitted Gagnet's expert report and spreadsheets prepared by him to estimate damages to the days-months subclass. The City objected to Gagnet's method of calculating damages and to his providing allegedly new opinions at trial.

The City called Barbara Featherston ("Featherston"), an engineer and the former head of DOWAS, and Robert Hanisee ("Hanisee"), a business analyst with the City's information technology department. Featherston and Hanisee each testified about how the City computes residential AWC rates and the method in which it quantifies, logs, and bills for residents' water usage and sewerage.

On March 10, 2021, the trial court signed an opinion awarding damages to plaintiffs. The trial court summarized the testimony of Gagnet, Featherston, and Hanisee, and noted, "The City did not present an expert witness, nor any other evidence, to contradict Mr. Gagnet's opinion." The trial court also noted that Gagnet's expert report was provided to the City more than two months prior to trial. The trial court determined that the days-months sub-class were entitled to damages in the principal amount of $9,626,894 with interest due from the date of judicial demand. On March 29, 2021, the trial court signed a judgment awarding same.

On June 28, 2021, the trial court signed a partial final judgment which stated that the parties stipulated that the amount of interest due from the date of judicial demand through June 28, 2021, was $1,773,047.20. The trial court then stated that having ruled on plaintiffs' motion for partial summary judgment as to liability, the City's motion for summary judgment, the issue of quantum as to the days-months subclass, and the amount of interest, it

designated its order as an appealable partial final judgment. The City now

appeals.

## DISCUSSION

The City raises the following assignments of error:

1. Whether the trial court erred in finding the City liable to the days-months subclass at the summary judgment stage of the proceedings.

2. Whether the trial court erred in awarding damages to the days-months sub-class, since the evidence failed to establish damages to a reasonable certainty.

3. Whether the trial court erred in allowing a CPA to offer expert opinion on damages modeling.

4. Whether the trial court erred in allowing a CPA to offer "new" opinions during the trial.

The City argues that the trial court did not consider legislative intent

in analyzing the City ordinance at issue. The City contends that the

Ordinance must be read and reconciled with the rest of the statutory scheme

and to do otherwise leads to absurd results. The City states that plaintiffs

failed to prove special damages to a reasonable degree of certainty and that

the trial court essentially found that, because the City did not call an expert

witness, it could award any amount that plaintiffs' expert supplied. The City

points out that there is no requirement in the law that one expert witness

must be countered by another. The City claims that Gagnet's testimony was

speculative and theoretical and he did not attempt to calculate individual

damages despite admitting he could have done so. The City asks that this

Court reverse the trial court's rulings.

Plaintiffs argue that the Ordinance is clear and unambiguous, and the

trial court's rulings are correct. Plaintiffs state that DOWAS does not read

meters and issue bills at precise intervals and that the City's meter-reading

10

and billing practices resulted in an inflated AWC for each class member. Plaintiffs argue that the Rules created by DOWAS are not of equal dignity with the City's code of ordinances, because the Rules were not accepted by the city council. Plaintiffs state that the executive branch is not tasked with creating or interpreting the laws, but that is the designated work of the legislature and the courts, respectively. Plaintiffs argue that the words of the Ordinance must be given their plain meaning.

With respect to the damages awarded, plaintiffs argue that the City: (1) failed to offer any expert witness testimony on damages; (2) failed to assert a timely motion pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); (3) failed to show at trial and preserve for appeal evidence of factual errors by plaintiffs' expert; and (4) is unable to show any manifest error in the trial court's exercise of its discretion in awarding damages. Plaintiffs ask that the trial court's rulings be affirmed.

The City filed a reply brief, but did not assert new arguments.

The denial of a motion for summary judgment is an interlocutory judgment and is appealable only when expressly provided by law. However, where there are cross-motions for summary judgment raising the same issues, this court can review the denial of a summary judgment in addressing the appeal of the granting of the cross-motion for summary judgment. See *Gray v. Am. Nat. Prop. & Cas. Co.*, 07-1670 (La. 2/26/08), 977 So. 2d 839; see also *Waterworks Dist. No. 1 of Desoto Par. v. Louisiana Dep't of Pub. Safety & Corr.*, 16-0744 (La. App. 1 Cir. 2/17/17), 214 So. 3d 1, *writ denied*, 17-0470 (La. 5/12/17), 219 So. 3d 1103. Furthermore, the denial of supervisory writs does not bar a different conclusion or

11

reconsideration of the same issue argued in the writ application when an appeal is taken from a final judgment. *Levine v. First Nat. Bank of Commerce,* 06-394 (La.12/15/06), 948 So. 2d 1051.

When summary judgment is granted in the context of statutory interpretation, there are no material issues of fact in dispute and the sole issue before us is a question of law as to the correct interpretation of the statute at issue. *Milbert v. Answering Bureau, Inc.*, 13-0022 (La. 6/28/13), 120 So. 3d 678. Appellate courts review motions for summary judgment *de novo*, using the same criteria that govern the trial court's consideration of whether summary judgment is appropriate. *Peironnet v. Matador Res. Co.*, 12-2292 (La. 6/28/13), 144 So. 3d 791; *Culberson v. Wells Fargo USA Holdings, Inc.*, 54,545 (La. App. 2 Cir. 6/29/22), 342 So. 3d 451.

After an opportunity for adequate discovery, a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(A)(3). The procedure is favored and shall be construed to secure the just, speedy, and inexpensive determination of actions. La. C.C.P. art. 966(A)(2).

The statutory and jurisprudential rules for statutory construction and interpretation apply to ordinances. *Par. of Caddo v. Durham*, 35,557 (La. App. 2 Cir. 5/8/02), 817 So. 2d 1173, *writ denied*, 02-1635 (La. 9/30/02), 825 So. 2d 1199. The starting point in the interpretation of any statute is the language of the statute itself. *City of Shreveport v. Shreveport Mun. Fire & Police Civil Serv. Bd.*, 52,410 (La. App. 2 Cir. 1/16/19), 264 So. 3d 643. Words and phrases shall be read with their context and shall be construed according to the common and approved usage of the language; technical

12

words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning. La. R.S. 1:3. When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. La. C.C. art. 9.

When the wording of a section is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit. La. R.S. 1:4. When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law. La. C.C. art. 10. When the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole. La. C.C. art. 12. Laws on the same subject matter must be interpreted in reference to each other. La. C.C. art. 13.

The Louisiana Supreme Court has stated, "[T]he plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters' [in which case] the intention of the drafters, rather than the strict language controls." *State v. Benoit*, 01-2712, p. 3 (La. 5/14/02), 817 So. 2d 11, 13, quoting *United States v. Ron Pair Enters. Inc.*, 489 U.S. 235, 242, 109 S. Ct. 1026, 103 L. Ed. 2d 290 (1989).

The following scholarship makes clear why strict statutory construction may be inappropriate:

> Considerations of text for statutory construction purposes must conceptually distinguish "ambiguous" text from text that results in an "absurd consequence" in application. The distinction is

important, as an "absurd consequence" may arise from the literal application of text that is clear and unambiguous in meaning and otherwise valid.

Questions of "ambiguity" generally seek the meaning of text in order to determine its proper application or constitutional validity. In contrast, questions of "absurd consequences" posit a specific application of text arising from its literal language, and ask whether the factual results of such application can be recognized as so inappropriate (even if constitutionally valid) as to be considered legally "absurd." In situations where the *application* of statutory or constitutional text is judicially determined to create an "absurd consequence," the literal language of the law need not be followed (emphasis in original).

20 P. Raymond Lamonica & Jerry G. Jones, La. Civ. L. Treatise § 7.4 (2ed.

2021).

The Ordinance reads:

Quantity charges for metered residential customers shall be based on 100 percent of water consumption unless the individual customer's average monthly water usage is less for the months of November, December, January and February, calculated after the month with the highest metered water usage and the month with the lowest metered usage have been eliminated.

The Shreveport City Charter states in part, "It is the intent of this

Charter that the water and sewerage systems shall be operated together as a

single self-supporting business enterprise, hereinafter in this section referred

to as 'the utility.'" Shreveport, La., Charter § 12.03 (1990). The City's

charter goes on to state:

The council shall from time to time, upon the recommendation of the mayor, fix the rates to be charged for water which need not be uniform for all consumers but shall be the same for each class of consumers, based upon the amount of water consumed during the billing period.

Shreveport, La., Charter § 12.03(c) (1990).

The liability of the City regarding the days-months issue relies upon

the trial court's interpretation of the words "monthly water usage" found in

14

the Ordinance. The term "monthly," has the following definitions: (1) occurring, appearing, or coming due once a month; (2) continuing or lasting for a month; (3) once a month; and (4) every month. *Webster's II New College Dict.,* 711 (2001). The term "monthly" does not refer to the specific days contained within a calendar month.

The City's charter and ordinances make it clear that water and sewerage utilities are meant to be considered as one "enterprise." Sewerage charges are dependent upon water meter readings. Therefore, the sewerage billing system is dependent upon the water billing system, which is not billed on a calendar month basis, but uses monthly billing periods. The City's water and sewer bills are distributed to its customers together on a single bill.

To interpret the Ordinance to mean that only the water used in the calendar months of November, December, January, and February must be used in calculating the AWC is illogical given that the residential water meters in Shreveport are read *manually*. When the Shreveport City Council passed the Ordinance, they did so with the understanding that the City's water meters were, and continue to be, read by a person who follows a route, going residence by residence to read water meters. To expect all manually read water meters in the City, consisting of tens of thousands of residences, to be read on the last day of every month is impossible given the system for reading water meters that the City has in place. When a law is clear and unambiguous and its application does not lead to absurd consequences, then it is interpreted as written. To so strictly construe the Ordinance as the trial court did here leads to such absurd consequences. Therefore, the trial court's rulings are reversed.

15

**CONCLUSION**

Accordingly, the judgment granting partial summary judgment in favor of appellees on the days-months issue is reversed. The judgment denying appellant's motion for summary judgment on the days-months issue is reversed. Based on the aforementioned, the rulings on damages and judicial interest for the days-months issue are also reversed, and the case is remanded for further proceedings. Costs are assessed to appellees.

**REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.**