# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

────────────────

### No. ACM 40282

────────────────

### UNITED STATES
*Appellee*

**v.**

### Cody R. JENNINGS
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

────────────────

Appeal from the United States Air Force Trial Judiciary

Decided 13 December 2023[1]

────────────────

*Military Judge*: Wesley Braun (Article 30a proceedings); Mark F. Rosenow.

*Sentence*: Sentence adjudged on 2 February 2022 by GCM convened at Offutt Air Force Base, Nebraska. Sentence entered by military judge on 5 April 2022: Dishonorable discharge, confinement for 40 months, reduction to E-1, and a reprimand.

*For Appellant*: Major Nicole J. Herbers, USAF (argued); Major Megan E. Hoffman, USAF; Major Frederick J. Johnson, USAF; Major Spencer R. Nelson, USAF.

*For Appellee*: Captain Jocelyn Q. Wright, USAF (argued); Colonel Matthew D. Talcott, USAF; Lieutenant Colonel Thomas J. Alford, USAF; Captain Olivia B. Hoff, USAF; Captain Tyler L. Washburn, USAF; First Lieutenant Deyana F. Unis, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, CADOTTE, and MASON, *Appellate Military Judges*.

Senior Judge CADOTTE delivered the opinion of the court, in which Chief Judge JOHNSON and Judge MASON joined.

─────────────

[1] The court heard oral argument in this case on 31 October 2023 at the American University Washington College of Law, Washington, D.C., as part of this court's Project Outreach Program.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

CADOTTE, Senior Judge:

A military judge sitting as a general court-martial at Offutt Air Force Base (AFB), Nebraska, convicted Appellant in accordance with his pleas and pursuant to a plea agreement, of four specifications of wrongful broadcast of intimate visual images,[2] four specifications of extortion, and one specification of assault in violation of Articles 117a, 127, and 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 917a, 927, 928.[3] After accepting Appellant's pleas, the military judge sentenced Appellant to a dishonorable discharge, confinement for 40 months, reduction to the grade of E-1, and a reprimand.

Appellant raised one issue on appeal: (1) whether his sentence is inappropriately severe. Appellant argues that "a dishonorable discharge and 40 months['] confinement is inappropriately severe given [Appellant's] record and the facts and circumstances of the convicted offenses." We specified and ordered oral argument on an additional issue: (2) whether Appellant's pleas of guilty to Specifications 1 and 2 of Charge V—wrongful broadcasting of intimate visual images—were provident when the conduct admitted by Appellant consisted of displaying images on his cellular phone for others to view.[4] We also considered an additional issue, not raised by Appellant, that was identified during this court's Article 66(d), UCMJ, 10 U.S.C. § 866(d), review: (3) whether Appellant is entitled to relief for facially unreasonable appellate delay in accordance with *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006), or *United States v. Tardif*, 57 M.J. 219 (C.A.A.F. 2002).

We find Appellant's pleas to Specifications 1 and 2 of Charge V, and Charge V, were not provident; we set aside the findings of guilty to Specifications 1 and 2 of Charge V, and to Charge V; and we reassess the sentence. We affirm the remaining findings and sentence as reassessed.

_____

[2] The four specifications of wrongful broadcast of intimate visual images include Specifications 1 and 2 of Charge V and Specifications 1 and 2 of the Additional Charge.

[3] All references in this opinion to the UCMJ are to the *Manual for Courts-Martial, United States* (2019 ed.).

[4] The providence of Appellant's pleas to wrongful broadcasting of intimate visual images as alleged in the Additional Charge is not at issue.

## I. BACKGROUND

Appellant's interactions with two female Airmen, BH and CM, resulted in the charges to which Appellant pleaded guilty. In April 2019, BH invited Appellant to a bar in downtown Omaha, Nebraska, where Appellant joined BH, BH's boyfriend, and others—who were all members from Appellant's squadron. While there, BH had a "verbal disagreement" with her boyfriend and then left the bar. Appellant followed BH out of the bar and found her crying and upset; Appellant "comforted and reassured" BH. Afterwards, BH started to walk away from him. The parties stipulated that Appellant then "grabbed [BH] by her hand or arm, pulled her toward him, pressed his lips against her lips and may have inserted his tongue into her mouth." The parties stipulated BH did not consent to Appellant kissing her and it "was an offensive touching that was done with force." Immediately afterwards, BH went back to the bar and Appellant followed her. They did not talk about the kiss and continued to socialize at the bar. Eventually they each separately returned to their respective homes for the evening.

The day after Appellant forcibly kissed BH, Appellant began sending text messages to BH. When sending the messages, Appellant used an application with his cell phone which disguised his phone number, a process known as "spoofing." The text messages BH received from Appellant did not come from phone numbers she associated with Appellant. Appellant did not reveal to BH that he was the person sending the text messages to her from the "spoofed" phone numbers. Using the "spoofed" numbers, Appellant extorted intimate images from BH. Appellant later "broadcasted" some of those sexual images of BH within her unit by text messaging the images.

Appellant's interactions with CM also resulted in criminal allegations. Appellant engaged in a romantic relationship with CM from October 2018 until February 2019. CM was a fellow Airman assigned to Offutt AFB during the charged timeframe. She was married to another military member who was in Appellant's squadron. According to the stipulation of fact, "while deployed [Appellant] messaged [CM] on Instagram and provided [CM] with information about [her husband] cheating on her. In exchange for that information, [Appellant] requested, and [CM] provided [Appellant], nude and intimate images of herself. [Appellant] and [CM] then started communicating regularly." During CM's relationship with Appellant, she sent him over 200 intimate visual images of herself. Specifications 1 and 2 of Charge V (hereinafter "Specification 1" and "Specification 2") alleged Appellant "broadcast" intimate images of CM.

On 18 January 2022, Appellant entered into a plea agreement with the convening authority. Consistent with the plea agreement, Appellant entered pleas of guilty, to include guilty pleas for Specifications 1 and 2. The military judge found Appellant's pleas to Specifications 1 and 2 provident and adjudged a sentence of four months confinement for each specification, to run concurrent with each other and consecutive with all other specifications.

## A. Visual Images Shown at Deployed Location (Specification 1)

At his court-martial, Appellant entered a plea of guilty to Specification 1, which alleged Appellant

> did, at or near [a deployed location], between on or about 1 August 2018 and on or about 31 December 2018, knowingly, wrongfully, and without the explicit consent of [CM], broadcast intimate visual images of [CM], who was at least 18 years of age when the visual images were created and is identifiable from the visual images or from information displayed in connection with the visual images, when he knew or reasonably should have known that the visual images were made under circumstances in which [CM] retained a reasonable expectation of privacy regarding any broadcast of the visual images, and when he knew or reasonably should have known that the broadcast of the visual images was likely to cause harm, harassment, intimidation, emotional distress, or financial loss for [CM], or to harm substantially [CM] with respect to her health, safety, business, calling, career, financial condition, reputation, or personal relationships, which conduct, under the circumstances, had a reasonably direct and palpable connection to a military mission or military environment.

In late 2018, while deployed, Appellant showed other Airmen on his shift intimate visual images of CM whom they recognized as the wife of another Airman. As indicated *supra* these images were provided to Appellant by CM voluntarily. During a colloquy associated with Specification 1, the military judge informed Appellant of the elements of Article 117a, UCMJ, to include "that at or near [a deployed location] between on or about 1 August 2018 and on or about 31 December 2018 [Appellant] knowingly and wrongfully broadcasted visual images of [CM]." The military judge further advised Appellant that "[t]he term broadcast means to electronically transmit a visual image with the intent that it be viewed by a person or persons." With regard to Specification 1, the military judge questioned Appellant as to the meaning of "broadcast" as follows:

4

[Military Judge (MJ)]: And did you broadcast this to them through a cell phone?

[Appellant]: Yes, Your Honor. Off of my cell phone.

MJ: What cell phone did you have at the time? What brand, what model, what size?

[Appellant]: At the time, Your Honor, I had a[n] iPhone 10. The non-pro model or max model. Just the normal-sized one.

MJ: How was it that you pulled up the image to be able to show it to them?

[Appellant]: It was on my – saved to my iMessages. Because we would message each other through iMessage since she also had an iPhone.

MJ: So it wouldn't have been some screensaver or something like that where without your intervention it came up? You deliberately pulled it up and showed it to them.

[Appellant]: Correct, Your Honor.

MJ: Is it right that you chose the ones to show to them?

[Appellant]: Yes, Your Honor.

MJ: Are you confident that this meets the definitions of broadcast that I have given to you?

[Appellant]: Yes, Your Honor.

MJ: Have you had time and opportunity to consult with your attorneys about the idea of broadcasting under this offense of the UCMJ?

[Appellant]: Yes, Your Honor.

MJ: As I said before the term broadcast means to electronically transmit a visual image with the intent that it be viewed by a person or persons. Would you agree that you electronically transmitted this image by manipulating your device so that it turned the digital file into a picture that was displayed on the screen?

[Appellant]: Yes, Your Honor.

MJ: Would that have happened but for your intervention or your accessing the device?

[Appellant]: No, Your Honor.

MJ: Was your intent when you pulled up these images that it be viewed by those three people?

[Appellant]: Yes, Your Honor.

MJ: And did that actually happen as you intended?

[Appellant]: Yes, Your Honor.

## B. Visual Images Shown in Omaha, Nebraska (Specification 2)

Except for the dates and location, Specification 2 was worded similarly to Specification 1. During the providence inquiry for Specification 2 Appellant explained how he displayed images of CM as follows:

[Appellant]: Yes, Your Honor. On or about 13 to 14 April of 2019, I was at [a] bar . . . located in Omaha, Nebraska with [BH] and [CR]. [CM] at the time was at a different bar, and I invited her to come out [to the bar]. [CM] said she would later, potentially. So while we were waiting for [CM] to come out, we were just hanging out drinking at [the bar]. I then showed two - I believe to be two images of intimate images of [CM] to [CR] and [BH]. [CM] had sent them to me previous to that [time] consensually, but also it was still under the don't show other people. I could have showed the group I was hanging out with different photos of [CM], rather than the intimate ones. And I know that I caused [CM] a lot of embarrassment and shame by doing that. I also realize that it changed the way that they look at [CM] as a member of the military, and as [a non-commissioned officer]. I don't have a legal or reason – excuse for doing it.

MJ: Describe these images for me.

[Appellant]: So one was an underwear clad picture of her buttocks, and the other was a picture of her in underwear and topless, exposing her breast.

When addressing "broadcast," the military judge questioned Appellant as follows:

MJ: What phone were you using to broadcast these images?

[Appellant]: That was after I got a new phone, so I had a Samsung Galaxy S9 plus.

> MJ: Like with the iPhone 10, is this something that you had to actively manage, so as to pull up the image?
>
> [Appellant]: Yes, sir.
>
> MJ: Would it have displayed without your intervention or effort?
>
> [Appellant]: No, Your Honor.

Later, while conducting a guilty plea inquiry for Specification 1 of the Additional Charge, which alleged another violation of Article 117a, UCMJ, the military judge again addressed "broadcast." Unlike Specifications 1 and 2, Appellant admitted he sent an image via a text message to another person, rather than merely showing an image to another person. However, at this point the military judge addressed "broadcast" in the context of case law, which he had not done during the providence inquiry for Specifications 1 and 2.

> MJ: Defense Counsel, one of the things we paused for at the start of this proceeding yesterday, and we got a little bit of a later beginning on the record, was so that you had time to consult again. And to the extent that you require consultation amongst yourselves or with your client before coming on the record and entering pleas on behalf of your client, one of the things that I oriented you to were the definitions available for broadcast under Article 117a[, UCMJ]. And so the cases that I referred you to discuss identical terms as are related through Article 120c[, UCMJ]. This was *United States v. Lajoie*[, 79 M.J. 723, 727 (N.M. Ct. Crim. App. 2019),] and [*United States v.*] *Davis*[, No. ARMY 20160069, 2018 CCA LEXIS 417, at *24 (A. Ct. Crim. App. 16 Aug. 2018) (mem.)[5]], which I have previously described on the record. We came back in. You all entered those pleas. It's clearly implied or suggested if not definitively answered that having reviewed those you are confident that the definition of broadcast is capable of capturing [Appellant] showing through his cellular phone other people images as is captured in Charge V and its specifications. Is that correct that you are confident and that you believe that that does meet the requirements of broadcast?
>
> [Trial Defense Counsel (TDC)]: Correct, Your Honor.

---

[5] During an earlier Rule for Courts-Martial 802 conference, the military judge made the parties aware of both cases.

> MJ: Thank you. Government, do you agree as well?
>
> [Trial Counsel]: Yes, sir. We do.

The definition of "broadcast" arose again later during the military judge's inquiry into the terms of the plea agreement:

> MJ: Any other motions that we haven't discussed yet, [TDC], that are in your mind potentially affected by this term other than all waivable motions, understood. But any other ones that there is a factual predicate that will need to be discussed beyond the ones that are captured in the notices of ruling?
>
> [TDC]: The one other I would like to raise, Your Honor, is the issue on broadcasting. Obviously we have discussed [th]is on the record pretty thoroughly, but just the circuit split, the discrepancy between the Army court in *Davis* and the Navy[-]Marine Corps court in *Lajo[ie]*. Had this been a litigated trial there might have been litigation on that given that there is no binding precedent at this time. But I am trying not to speak out of both sides of my mouth, of course, Your Honor. But, we do – it would have nothing to do with the providency of the plea or our position on the providency of the plea but that would have been an advocacy tactic that we likely would have pursued had just got [sic] a different direction.

## II. DISCUSSION

### A. Providence of Guilty Plea

Appellant's argument on appeal in response to the specified issue is that the military judge abused his discretion by accepting Appellant's guilty pleas to Specifications 1 and 2.

#### 1. Law

##### *a. Guilty Plea*

We review a military judge's decision to accept an accused's guilty plea for an abuse of discretion. *United States v. Riley*, 72 M.J. 115, 119 (C.A.A.F. 2013) (citing *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008)). However, this abuse of discretion review still entails de novo review for questions of law arising from the guilty plea. *Inabinette*, 66 M.J. at 322. "[W]e apply the substantial basis test, looking at whether there is something in the record of trial, with regard to the factual basis or the law, that would raise a substantial question regarding the appellant's guilty plea." *Id.*

"The military judge shall not accept a plea of guilty without making such inquiry of the accused as shall satisfy the military judge that there is a factual basis for the plea." Rule for Courts-Martial 910(e).

A military judge "has a duty to accurately inform an appellant of the nature of his offense and an essential aspect of informing is a correct definition of legal concepts." *United States v. Murphy*, 74 M.J. 302, 308 (C.A.A.F. 2015) (internal quotation marks, alterations, and citations omitted).

> [F]ailure to define correctly a legal concept or explain each and every element of the charged offense to the accused in a clear and precise manner is not reversible error if it is clear from the entire record that the accused knew the elements, admitted them freely, and pleaded guilty because he was guilty.

*Id*. (internal quotation marks, alteration, and citations omitted).

"Even if a guilty plea is later determined to be improvident, a reviewing court may grant relief only if it finds that the military judge's error in accepting the plea 'materially prejudice[d] the substantial rights of the accused.'" *United States v. Mortadella*, 82 M.J. 1, 4 (C.A.A.F. 2021) (alteration in original) (quoting Article 45(c), UCMJ, 10 U.S.C. § 845(c)). In reviewing the providence of an appellant's guilty pleas, "we consider his colloquy with the military judge, as well as any inferences that may reasonably be drawn from it." *United States v. Timsuren*, 72 M.J. 823, 828 (A.F. Ct. Crim. App. 2013) (quoting *United States v. Carr*, 65 M.J. 39, 41 (C.A.A.F. 2007)).

### b. Statutory Construction

We review interpretation of a statute de novo. *United States v. Kohlbek,* 78 M.J. 326, 330–31 (C.A.A.F. 2019) (citation omitted). "In conducting this de novo review, this Court employs principles of statutory construction." *United States v. Beauge*, 82 M.J. 157, 162 (C.A.A.F. 2022) (citing *Kohlbek*, 78 M.J. at 330). "As in all statutory construction cases, we begin with the language of the statute." *United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019) (quoting *Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 450 (2002)). "In the absence of a statutory definition, the plain language of a statute will control unless it is ambiguous or leads to an absurd result." *United States v. Cabuhat*, __ M.J. __, No. ACM 40191, 2023 CCA LEXIS 387, at *14 (A.F. Ct. Crim. App. 13 Sep. 2023) (en banc) (citing *United States v. Lewis*, 65 M.J. 85, 88 (C.A.A.F. 2007)). "[W]hether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case" is the starting point for determining the meaning of the statute. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). Such "inquiry must cease if the statutory language is

unambiguous and 'the statutory scheme is coherent and consistent.'" *Id.* (quoting *United States v. Ron Pair Enters.*, 489 U.S. 235, 240 (1989)) (additional citation omitted). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* at 341 (first citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477 (1992); and then citing *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991)). When we see a "facial ambiguity . . . , we must interpret it in light of the broader context of the rule." *Beauge,* 82 M.J. at 162 (citation omitted).

"[W]hen a word has an easily graspable definition outside of a legal context, authoritative lay dictionaries may also be consulted." *Cabuhat*, 2023 CCA LEXIS 387, at *15 (quoting *United States v. Schmidt*, 82 M.J. 68, 75–76 (C.A.A.F. 2022), *cert. denied*, 143 S. Ct. 214 (2022)); *see also Wooden v. United States*, 142 S. Ct. 1063, 1069 (2022) (utilizing only lay dictionaries to define the word "occasion").

Finally, if textual analysis alone of the plain meaning of an ambiguous statutory term cannot sufficiently resolve its meaning, reviewing courts may refer to legislative history: "Unclear language can become clear . . . if the congressional intent behind the legislation is reviewed." *United States v. Escobar*, 73 M.J. 871, 875 (A.F. Ct. Crim. App. 2014) (citations omitted).

### c. Wrongful Broadcast of Intimate Visual Images

The relevant portions of Article 117a, UCMJ, state any person subject to the UCMJ:

> (1) who knowingly and wrongfully broadcasts or distributes an intimate visual image of another person or a visual image of sexually explicit conduct involving a person who—
>
> (A) is at least 18 years of age at the time the intimate visual image or visual image of sexually explicit conduct was created;
>
> (B) is identifiable from the intimate visual image or visual image of sexually explicit conduct itself, or from information displayed in connection with the intimate visual image or visual image of sexually explicit conduct; and
>
> (C) does not explicitly consent to the broadcast or distribution of the intimate visual image or visual image of sexually explicit conduct;
>
> (2) who knows or reasonably should have known that the intimate visual image or visual image of sexually explicit

conduct was made under circumstances in which the person depicted in the intimate visual image or visual image of sexually explicit conduct retained a reasonable expectation of privacy regarding any broadcast or distribution of the intimate visual image or visual image of sexually explicit conduct;

(3) who knows or reasonably should have known that the broadcast or distribution of the intimate visual image or visual image of sexually explicit conduct is likely—

(A) to cause harm, harassment, intimidation, emotional distress, or financial loss for the person depicted in the intimate visual image or visual image of sexually explicit conduct; or

(B) to harm substantially the depicted person with respect to that person's health, safety, business, calling, career, financial condition, reputation, or personal relationships; and

(4) whose conduct, under the circumstances, had a reasonably direct and palpable connection to a military mission or military environment, is guilty of wrongful distribution of intimate visual images or visual images of sexually explicit conduct and shall be punished as a court-martial may direct.

10 U.S.C. § 917a(a).

The statute defines the term "broadcast" as "to electronically transmit a visual image with the intent that it be viewed by a person or persons." "The term 'distribute' means to deliver to the actual or constructive possession of another person, including transmission by mail or electronic means." 10 U.S.C. § 917a(b)(2). "Electronically transmit" is not defined in the statute; however, "visual image" is defined as:

(A) Any developed or undeveloped photograph, picture, film, or video.

(B) Any digital or computer image, picture, film, or video made by any means, including those transmitted by any means, including streaming media, even if not stored in a permanent format.

(C) Any digital or electronic data capable of conversion into a visual image.

10 U.S.C. § 917a(b)(7).

**2. Analysis**

The essential question before us is whether Appellant's display of intimate images of CM on his phone so that others could see them was a "broadcast"— that is, an electronic transmission—of a "visual image" for purposes of Article 117a, UCMJ. Before addressing the positions of the parties, we first consider our sister-courts' decisions with respect to defining "electronically transmit." The statutory definition for "broadcast" contained in Article 117a and Article 120c, UCMJ, are identical and both include a requirement that to "broadcast" an accused must "electronically transmit" a "visual image." Our court has not previously addressed the statutory definition for "broadcast" for either Article 117a or Article 120c, UCMJ. However, two of our sister courts have addressed the definition of "broadcast" in relation to Article 120c, UCMJ.

In *Davis*, the United States Army Court of Criminal Appeals (ACCA) found the appellant's guilty plea to a violation of Article 120c, UCMJ, improvident— concluding that "the mere act of playing [a] video recording" on a cellular phone in front of another person did not constitute "broadcasting." 2018 CCA LEXIS 417, at *24. In coming to this conclusion, the ACCA considered dictionary definitions for "electronic" and "transmit."[6] The ACCA found these definitions taken together "require an electronic device to send the transmission and an electronic device to receive the transmission." *Id.* at *25. The ACCA concluded, "there [was] no basis for finding that Congress intended the definition of 'broadcast' to include the mere physical act of displaying a video." *Id.* at *26.

In contrast, the United States Navy-Marine Corps Court of Criminal Appeals (NMCCA) held in *Lajoie* the "prohibition on the broadcast of an indecent visual recording is violated when an individual uses an electronic device to display the recording for another to view." 79 M.J. at 727. The NMCCA concluded:

> [W]e do not find that the involvement of more than one electronic
> device is necessary for a broadcast to occur. If the transmission

---

[6] The ACCA determined that:

> The pertinent definition of "electronic" is "utilizing devices constructed or working by the methods or principles of electronics." The most relevant definition of "transmit" is "to send out a signal either by radio waves or over a wire line." The combination of these two definitions appears to require an electronic device to send the transmission and an electronic device to receive the transmission. In this case, there is only one electronic device – appellant's cell phone.

*Davis*, 2018 CCA LEXIS 417, at *24–25 (citations and footnote omitted).

> from one electronic device to another electronic device has the
> effect of delivering actual or constructive possession of the image
> to another person, then the act constitutes a "distribution" of the
> image—a separate offense under Article 120c[, UCMJ].

*Id.* The NMCCA further concluded that even if the court applied the narrow interpretation of "electronically transmit" used by the ACCA, "the essence of their requirement for transmission between electronic devices would be satisfied by the electronic transmission of an image that takes place from . . . the phone's digital storage area or memory card to the phone's display screen when played." *Id.*

Appellant argues, as to the specified issue, that "[t]he plain language of Article 117a[, UCMJ,] and the ordinary meanings of the words 'broadcast' and 'electronic transmission' show that the statute does not contemplate the conduct [Appellant] pleaded guilty to." Appellant's position is that "transmit" requires movement of a signal from one device which is capable of being received by another device. As Appellant merely showed an image on his cellular phone and did not send a signal capable of being received by another device, we should find Appellant's plea to Charge V and its specifications improvident. Consequently, Appellant argues we should "dismiss Charge V and its specifications with prejudice and order his sentence to confinement reduced by four months."

The Government argues that a "[a] substantial basis in law or fact does not exist to question [Appellant's] plea," and therefore, "[t]he military judge did not abuse his discretion and this [c]ourt should uphold Appellant's plea as provident." The Government's position mirrors that of the NMCCA's primary position in *Lajoie*—that "electronically transmit" means to pass or convey through a medium (any medium) by an electronic means with no requirement that another device be involved or able to receive the signal.

Although both parties assert their understanding represents the plain meaning of the words "electronically transmit," both draw on other principles of statutory construction, including reference to lay dictionary definitions. Relevant definitions of "electronic" include "of, relating to, or utilizing devices constructed or working by the methods or principles of electronics," and "of, relating to, or being a medium (such as television) by which information is transmitted electronically." MERRIAM-WEBSTER, *Electronic*, https://www.merriam-webster.com/dictionary/electronic (last visited 4 Dec. 2023). Relevant definitions of "transmit" include "to send or convey from one person or place to another;" "to cause (something, such as light or force) to pass or be conveyed through space or a medium;" or "to send out (a signal) either by

13

radio waves or over a wire." MERRIAM-WEBSTER, *Transmit*, https://www.merriam-webster.com/dictionary/transmit (last visited 4 Dec. 2023). Our reading of these definitions taken together, in conjunction with the statutory definition of "visual image," leads us to conclude that "electronically transmit" requires that, in the context of this case, the digital image or picture, or digital or electronic data capable of conversion into a visual image, be not merely displayed on the device, but sent out from it.

We depart somewhat from *Davis* as the ACCA found a requirement that a transmission not only be sent out, but it must also be received by an electronic device. *Davis*, 2018 CCA LEXIS 417, at *25. We find only a requirement that the visual image be sent out to be "transmitted," as this understanding is strictly tethered to the most applicable definition of "transmit"—"to send out (a signal) either by radio waves or over a wire." MERRIAM-WEBSTER, *Transmit*. In addition, this interpretation solidifies the distinction between "broadcast" and "distribution," actions which the statute separately proscribes, consistent with the "surplusage" canon of statutory interpretation against finding superfluous language in a statute. *See Yates v. United States*, 574 U.S. 528, 543 (2015); *United States v. Sager*, 76 M.J. 158, 162 (C.A.A.F. 2017) (citing *Yates*).

We disagree with the Government that the punitive article's requirement for an image to be "transmitted" is satisfied by the light from a digital image reaching the viewer's eyes. Rather, the text of the statute requires the "visual image" itself as defined by the statute—to include, *inter alia*, digital or electronic data capable of conversion into a visual image—that must be sent out for there to be a "transmission." Appellant did not send such a "visual image" merely by displaying his phone's screen; instead he converted electronic data into a visual image. *See* 10 U.S.C. § 917a(b)(7)(C). We are likewise unpersuaded that a phone internally accessing a digital storage area to enable an image to be viewed on the phone's display screen satisfies the requirement to "electronically transmit" the image. We find that under these circumstances the image remained on the originating device, and movement between components of the phone does not equate to the image being "sent out."[7]

---

[7] We find our interpretation of "electronically transmit" consistent with the legislative history of Article 117a, UCMJ. "Article 117a[,UCMJ,] was first proposed as H.R. 2052. In House debate, it was described as responding to 'the offensive Marines United Facebook page and others like it. On these pages, male [M]arines posted nude or intimate photos of female servicemembers and veterans without their consent.'" *United States v. Grijalva*, 83 M.J. 669, 673 (C.G. Ct. Crim. App. 2023) (second alteration in original) (quoting *RAISING AWARENESS OF MARINES UNITED*

We find the focus of the military judge's colloquy with Appellant was on the conduct of "displaying" the images, which the military judge found sufficient to satisfy the "broadcasting" requirement. As such, the military judge had an erroneous view of the law. As enacted by Congress, Article 117a, UCMJ, does not prohibit the mere "display" of an image. Congress could have proscribed "display" in addition to "broadcast" and "distribute." However, it did not.

Consequently, we set aside the findings of guilty as to Specifications 1 and 2 of Charge V and Charge V and reassess the sentence as to the remaining findings of guilty. In doing so, we also find the plea agreement unenforceable in part because, as a matter of law, Appellant is unable to providently plead guilty to Specifications 1 and 2 of Charge V as required by the agreement. We find upholding the remainder of the plea agreement consistent with Appellant's requested remedy and in the interests of judicial economy.

**B. Sentence Reassessment**

**1. Law**

Under Article 59(a), UCMJ, a court-martial sentence may not be held incorrect by virtue of legal error "unless the error materially prejudices the substantial rights of the accused." 10 U.S.C. § 859(a). If a Court of Criminal Appeals (CCA) can conclude that an adjudged sentence would have been of at least a certain severity absent any error, "then a sentence of that severity or less will be free of the prejudicial effects of error; and the demands of Article 59(a)[, UCMJ,] will be met." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986).

---

*OFFENSIVE FACEBOOK PAGE*, 163 Cong. Rec. H3052, 115th Cong. (2017) (statement of Rep. Frankel)), *rev. granted*, __ M.J. __, No. 23-0215, 2023 CAAF LEXIS 690, at \*1 (C.A.A.F. 3 Oct. 2023). "Thousands and thousands of photos of women were shared on these Facebook pages." *RAISING AWARENESS OF MARINES UNITED OFFENSIVE FACEBOOK PAGE*, 163 Cong. Rec. H3053, 115th Cong. (2017) (statement of Rep. Frankel). "No woman should have her private photos exposed on the [I]nternet, especially not by her fellow servicemembers." *Id.*

> That is why I am pleased to cosponsor Congresswomen Speier's and McSally's bill, H.R. 2052, the PRIVATE Act, which is a bipartisan bill that would make it illegal within the Uniform Code of Military Justice to distribute intimate images of a person if that person had a reasonable expectation of privacy.

*Id.* "I want to make it clear. Exploiting sexual images of fellow servicemembers online is unacceptable, and it should be a crime." *Id.* Based on the congressional record, Article 117a, UCMJ, was enacted to address the posting of intimate images on the Internet without the consent of the victim.

CCAs have broad discretion first to decide whether to reassess a sentence, and then to arrive at a reassessed sentence. *United States v. Winckelmann*, 73 M.J. 11, 12 (C.A.A.F. 2013). In deciding whether to reassess a sentence or return a case for a rehearing, we consider the totality of the circumstances including the following factors: (1) "[d]ramatic changes in the penalty landscape and exposure;" (2) whether the appellant was sentenced by court members or a military judge; (3) "[w]hether the nature of the remaining offenses capture[s] the gravamen of criminal conduct included within the original offenses and . . . whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses;" and (4) "[w]hether the remaining offenses are of the type that judges of the [CCAs] should have the experience and familiarity with to reliably determine what sentence would have been imposed at trial." *Id.* at 15–16 (citations omitted). These factors are "illustrative, but not dispositive, points of analysis" to be considered as part of "the totality of the circumstances presented." *Id.* at 15.

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (footnote omitted). This court "may affirm only . . . the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1). CCAs "assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (en banc) (per curiam) (alteration in original) (citation omitted). Although this court has broad discretion in determining whether a particular sentence is appropriate, and Article 66, UCMJ, empowers us to "do justice," we have no authority to "grant mercy" by engaging in exercises of clemency. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010) (citation omitted).

A plea agreement with the convening authority is "some indication of the fairness and appropriateness of [an appellant's] sentence." *United States v. Perez*, No. ACM S32637 (f rev), 2021 CCA LEXIS 501, at *7 (A.F. Ct. Crim. App. 28 Sep. 2021) (unpub. op.) (footnote omitted).

**2. Analysis**

Pursuant to the terms of the plea agreement the military judge sentenced Appellant to a term of four months of confinement each for Specifications 1 and 2. These confinement sentences ran currently with each other, and

consecutively with all other specifications. Appellant contends his sentence should be reduced by four months. We agree.

All four *Winckelmann* factors weigh in favor of reassessment: (1) we find our set-aside of the two indecent broadcasting specifications has not resulted in a dramatic change to the penalty landscape as the maximum confinement has been reduced only by four months as a result of the terms of the plea agreement; (2) Appellant was sentenced by a military judge and as the United States Court of Appeals for the Armed Forces (CAAF) explained "[a]s a matter of logic, judges of the [CCAs] are more likely to be certain of what a military judge would have done as opposed to members," *Winckelmann*, 73 M.J. at 16; (3) the remaining seven specifications capture the gravamen of Appellant's criminal conduct; and (4) the remaining offenses are of the type that we have the experience and familiarity with to reliably determine what sentence would have been imposed at trial. Accordingly, we find sentence reassessment is appropriate.

Having found reassessment appropriate, we next consider the sentence the military judge would have imposed had he convicted Appellant of the remaining charged offenses. *See id.* at 15 (holding CCAs may reassess a sentence if it "can determine to its satisfaction that, absent any error, the sentence adjudged would have been of at least a certain severity" (citation omitted)). Taking all factors into consideration, the essential nature of Appellant's misconduct remains unchanged, and we conclude that the military judge would have imposed the same sentence for the remaining specifications. However, we conclude our set-aside undermines the language of the adjudged reprimand. Accordingly, we reassess the sentence to consist of a dishonorable discharge, confinement for 36 months, and reduction to the grade of E-1.

In reassessing Appellant's sentence, we have also given full consideration to Appellant and to the appropriateness of his sentence. After our careful consideration of the matters contained in the record, the nature and seriousness of Appellant's offenses, and his record of service, we find the sentence, as reassessed, is not inappropriately severe.

## C. Timeliness of Appellate Review

Additionally, we consider whether Appellant is entitled to relief for a facially unreasonable appellate delay. *Moreno*, 63 M.J. at 135 (citations omitted); *Tardif*, 57 M.J. at 223–24. We decline to grant such relief.

### 1. Law

We review de novo whether an appellant has been denied the due process right to speedy appellate review. *Moreno*, 63 M.J. at 135 (citations omitted). A

presumption of unreasonable delay arises when appellate review is not completed and a decision rendered within 18 months of a case being docketed. *Id.* at 142. A presumptively unreasonable delay triggers an analysis of the four factors specified in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citations omitted). A presumptively unreasonable delay satisfies the first factor, but the Government "can rebut the presumption by showing the delay was not unreasonable." *Id*. at 142. Assessing the fourth factor of prejudice, we consider the interests of "prevention of oppressive incarceration pending appeal;" "minimization of anxiety and concern of those convicted awaiting the outcome of their appeals;" and "limitation of the possibility that . . . grounds for appeal, and . . . defenses in case of reversal and retrial, might be impaired." *Id*. at 138–39 (citations omitted). In the absence of prejudice as identified in *Moreno*, a due process violation exists only when "the delay is so egregious that tolerating it would adversely affect the public's perception of the fairness and integrity of the military justice system.*" United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Furthermore, we are required by Article 66(d), UCMJ, to determine which findings of guilty and the sentence or part thereof "should be approved." 10 U.S.C. § 866(d); *see also Tardif*, 57 M.J. at 224. In *Tardif*, the CAAF recognized "a [CCA] has authority under Article 66[ ][, UCMJ,] to grant relief for excessive post-trial delay without a showing of 'actual prejudice' within the meaning of Article 59(a)." 57 M.J. at 224 (citation omitted). The essential inquiry under *Tardif* is whether, given the post-trial delay, the sentence "remains appropriate[ ] in light of all circumstances." *Toohey*, 63 M.J. at 362 (citing *Tardif*, 57 M.J. at 224).

### 2. Analysis

Appellant's case was docketed with the court on 20 May 2022. The delay in rendering this decision after 20 November 2023 is considered presumptively unreasonable. The reasons for the delay include the time required for Appellant to file his brief on 30 January 2023, and the Government to file its answer on 1 March 2023.[8] On 8 September 2023, we specified issue (2) for briefing. On 25 September 2023, both Appellant and the Government filed specified issue briefs. Additionally, on 27 September 2023, we issued an order for oral argument which was held on 31 October 2023. Appellant has made no

---

[8] Appellant filed six motions for enlargement of time, all of which were opposed by the Government.

specific claim of prejudice, and we find none. Because we find no particularized prejudice, and the delay is not so egregious as to adversely affect the public's perception of the fairness and integrity of the military justice system, there is no due process violation. *See Toohey*, 63 M.J. at 362.

We also conclude there is no basis for relief under Article 66(d)(2), UCMJ, or *Tardif* in the absence of a due process violation. *See United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016). Considering all the facts and circumstances of Appellant's case, we decline to exercise our Article 66(d), UCMJ, authority to grant relief for the delay in completing appellate review.

### III. CONCLUSION

The findings of guilty to Specifications 1 and 2 of Charge V, and Charge V, are **SET ASIDE**, and Specifications 1 and 2 of Charge V, and Charge V, are **DISMISSED**. We reassess the sentence to a dishonorable discharge, confinement for 36 months, and reduction to the grade of E-1. The remaining findings, and the sentence as reassessed, are correct in law and fact, and no other error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). The remaining findings, and the sentence as reassessed, are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court